WARD B. ZIMMERMAN, Petitioner v. APPALACHIAN STATE UNIVERSITY; BOARD
OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA, Respondents

No. COA00-1363

(Filed 5 March 2002)

1. Colleges and Universities— non-tenured university faculty
member—refusal of reappointment—authority of provost
to override dean's recommended decision

The trial court erred by reversing the Board of Governors'
final agency decision denying petitioner non-tenured university
faculty member further review of his grievance against a univer-
sity and by concluding that a university provost lacked authority
to override a university dean's recommendation to reappoint peti-
tioner, because: (1) N.C.G.S. § 116-11.2 provides that the Board of
Governors is responsible for the constituent universities, and the
Board of Governors created a code with regulations stating that
the chancellor and provost generally have authority to make
employment decisions regarding faculty members; and (2) the
university's regulations provide that the provost has specific
power to overrule a dean's recommendation of reappointment.

2. Colleges and Universities— non-tenured university faculty
member—refusal of reappointment—whole record test—
prima facie case of wrongful nonreappointment

The whole record test reveals that the trial court erred by
reversing the Board of Governors' final agency decision denying
petitioner non-tenured university faculty member further review
of his grievance against a university and by concluding peti-
tioner made a prima facie case that he had been wrongfully
nonreappointed, because: (1) the evidence only established that
petitioner was a tenure-track professor who, despite recommen-
dation of his dean, was not reappointed; and (2) petitioner did not
allege that he was the victim of discrimination, that his First
Amendment rights had been abridged, or that there was personal
malice.

3. Colleges and Universities— non-tenured university faculty
member—refusal of reappointment—whole record test—
arbitrary and capricious

A review of the whole record reveals that the trial court erred
by reversing the Board of Governors' final agency decision deny-

ing petitioner non-tenured university faculty member further review of his grievance against a university and by concluding the Board of Governors' denial of further review of petitioner's appeal was arbitrary and capricious and infected with errors of law, because: (1) the findings and conclusions of the FGHC, the Chancellor, the Trustees, and the Board of Governors regarding the issue of personal malice and the issues raised by petitioner in his application for a FGHC hearing, other than the erroneous conclusion that petitioner had presented a prima facie case, were supported by substantial evidence; and (2) at each level of university appeal the correct standard of decision-making and review was applied, and the Board of Governors' decision to leave undisturbed the decision of the Trustees was based upon its conclusions.

Appeal by respondents from interlocutory orders entered 16 February 1998 by Judge Forrest Bridges, and from judgment entered 15 August 2000 by Judge Jessie B. Caldwell, III, all orders entered in Watauga County Superior Court. Cross-appeal by petitioner from order of 18 August 2000. Heard in the Court of Appeals 10 October 2001.

*Ferguson, Stein, Wallas, Adkins, Gresham, & Sumter, P.A. by John W. Gresham, for petitioner.*

*Attorney General Roy Cooper, by Assistant Attorney General Joyce S. Rutledge, for the respondent.*

BIGGS, Judge.

This appeal arises from a 1995 decision by administrators of Appalachian State University (ASU) not to offer a reappointment contract to Ward B. Zimmerman (petitioner), at that time a non-tenured faculty member. The trial court's order reversed the decision of the Board of Governors to leave undisturbed the earlier decisions by ASU's Chancellor and its Trustees, and ordered petitioner reinstated to the ASU faculty. For the reasons that follow, we reverse the trial court.

The record, including the transcript of a hearing conducted by ASU's Faculty Grievance Hearing Committee (FGHC), establishes the following facts: Petitioner was first employed by ASU in 1990, when he accepted a position as Vice Chancellor for Business Affairs. He served ASU in this capacity until 1994, during which time he also

taught classes at ASU on an intermittent basis. For the 1990-91 school year, he held a one-year appointment, carrying "no remuneration or tenure consideration," as an associate professor in his "home" school, the Walker College of Business.

ASU hired a new Chancellor, Francis T. Borkowski, in 1993. Shortly after his arrival, Chancellor Borkowski asked petitioner to resign as Vice Chancellor for Business Affairs, and offered to assist him with a transition to another position. Chancellor Borkowski and petitioner agreed that after petitioner resigned as Vice Chancellor, he would receive an appointment as an untenured faculty member at ASU. On 17 November 1993, Chancellor Borkowski and petitioner signed a "Letter of Understanding," memorializing their agreement on petitioner's future status at ASU. This memorandum provided that after petitioner resigned as Vice Chancellor, he would be allowed "reasonable use" of university facilities "to pursue his search for a Presidency," and would "be awarded faculty status as a full professor," in an appointment which would be "ongoing, continuing and accrue the full benefits which are awarded to other University individuals of this rank." Thereafter, administrators within ASU sought a faculty position for petitioner. In July 1994, Provost Durham (Provost) found a teaching position for petitioner in the College of Education, within the Department of Leadership and Educational Studies. On 29 July 1994, petitioner was offered a one year, tenure-track appointment to a faculty position at ASU, for the 1994-95 school year, which he accepted. In September, 1995, petitioner's contract was renewed for another one year term, for the 1995-96 school year.

In October, 1995, the Provost received a letter from Dean Duke of the College of Education (the dean), ratifying the recommendation of petitioner's department chair, that petitioner be reappointed for a three-year contract upon the expiration of the 1995-96 school year. The Provost contacted Chancellor Borkowski, and expressed his disagreement with this recommendation. On 13 November 1995, the Provost notified petitioner by mail that he would not be reappointed when his current contract expired. After receiving the nonreappointment letter, Petitioner met with ASU administrators to discuss his situation, and then, on 26 February 1996, petitioner wrote to the FGHC to request a hearing.[1]

---

1. The FGHC is an advisory committee comprised of ASU faculty members, which is authorized by the ASU faculty handbook to conduct hearings to determine if a "right or entitlement . . . conferred by university policy or state or federal laws, [has been] abridged[.]" FGHC then submits a report to ASU administrators, containing its findings and recommendations.

Petitioner's application for a hearing raised a number of issues regarding the validity of his nonreappointment; these issues are summarized as follows:

1. Procedural defects in the notice of nonreappointment: the letter was sent by the Provost, rather than by the Dean, and it did not directly reference the ASU faculty handbook sections on the grievance procedure.

2. Length of notice: petitioner received 180 days notice of nonreappointment, rather than 365 days.

3. Provost's nonreappointment authority: petitioner contended that the Provost lacked the power to override a Dean's recommendation of reappointment of a provisional faculty member.

4. Petitioner's status: petitioner contended that he was already a tenured professor, because his 1990-91 faculty appointment had never been explicitly rescinded, and thus his 1994 appointment as "full professor" was a "promotion" that conferred tenure.

The FGHC conducted a hearing on these issues during April, 1996, and issued its report 26 April 1996. The report addressed each of petitioner's allegations, and found none of them to be proven by the preponderance of the evidence; its findings of fact are summarized as follows:

1. Petitioner was not prejudiced by the procedural defects in the notice of nonreappointment.

2. Petitioner had only one year continuous service as a faculty member, and was entitled to only 180 days notice of nonreappointment.

3. The provost "has authority to participate in decision-making" on nonreappointments.

4. FGHC found that petitioner was fired as Vice Chancellor, that the school of business, his home college, did not want him on their faculty, that finding him a faculty position was difficult, and that to "construe this as a promotion is absurd."

Pursuant to these findings, the FGHC dismissed all of petitioner's claims. In addition to the above findings and conclusions, which addressed each of the issues raised in petitioner's application for a hearing, the FGHC made these additional findings and recommendations summarized as follows:

ZIMMERMAN v. APPALACHIAN STATE UNIV.

[149 N.C. App. 121 (2002)]

1. FGHC held that a tenure candidate who has demonstrated "professional competence" and "potential for future contributions" to the university, but is not awarded tenure, has made a *prima facie* case of wrongful nonreappointment.

2. FGHC held that the Provost's proffer of institutional need as an explanation for the nonreappointment had shifted the burden to respondents, requiring a "clear showing of institutional need sufficient to outweigh consideration of [petitioner's] demonstrated professional competence and potential for future contributions."

3. FGHC concluded that it needed more guidance in order to "judge the validity of a non-reappointment based on institutional need," and recommended petitioner's reinstatement while guidelines were developed.

4. FGHC found that ASU administrators had used petitioner's tenure-track faculty appointment as a "golden parachute," or "springboard for job-hunting," and advised ASU administrators not to "meddle in the affairs of the faculty."

On 31 July 1996, Chancellor Borkowski issued his decision regarding petitioner's grievances, stating that such decision was made "after careful review" of the FGHC's report. Chancellor Borkowski accepted all of the FGHC's conclusions and holdings regarding the issues raised by petitioner in his request for a hearing. He concluded that the FGHC had found none of the grievances that petitioner raised in his application for a hearing to be proven by a preponderance of the evidence, and that petitioner had not established a right to continued employment under any university policy, or state or federal law. With respect to the FGHC's findings on matters not raised in petitioner's application for hearing, Chancellor Borkowski rejected the FGHC's proposal that a new basis for faculty challenge to nonreappointment be identified, and its recommendation that petitioner be reinstated, finding these to be based upon the committee's consideration of matters not within its purview. Accordingly, Chancellor Borkowski denied relief to petitioner.

Chancellor Borkowski agreed to take under advisement the FGHC's suggestions for amendments to the faculty handbook clarifying the extent of the Provost's authority, and to consider its recommendations on the proper use of faculty appointments. However, he also stated that the issue of "institutional need" should not have been

considered by the FGHC, because (1) it had not been raised by petitioner in his application for a hearing, (2) ASU administrative assessment of institutional need in making personnel decisions was not a proper basis for a grievance, because administrators are *required* to consider institutional need, and (3) the FGHC did not have jurisdiction to conduct an evaluation of the relative weight accorded by ASU administrators to factors, such as institutional need, that are properly a part of a personnel decision.

On 8 August 1996, petitioner appealed Chancellor Borkowski's decision to the ASU Board of Trustees (Trustees). Petitioner presented two issues to the Trustees. First, he argued that he had not received timely notice of appeal, in that he was entitled to 365 days notice, not 180 days. Secondly, he contended that "the nature of the non-renewal was substantially flawed and raised an inference of bias which was not rebutted by the Provost." The Trustees reviewed the record established by the FGHC's hearing, to determine whether Chancellor Borkowski's decision was "clearly erroneous." On 26 March 1996, the Trustees issued their decision, which concurred with the FGHC and Chancellor Borkowski that (1) petitioner was a tenure-track faculty member entitled to only 180 days notice of nonreappointment, (2) petitioner was not prejudiced by receiving notice from the Provost instead of the Dean, and (3) the Provost was authorized to make determinations regarding reappointment. In addition, the Trustees found that petitioner had "never presented evidence that amounted to a *prima facie* case of personal malice." They therefore concluded that it was "never incumbent upon the [Provost] to offer any explanation for his decision," and that there was "no proper occasion to inquire into the *bona fides* of the 'institutional needs' rationale." The Trustees stated that, as a general rule, the validity of alleged institutional needs "properly becomes an issue in a grievance inquiry" only "when the aggrieved faculty member first establishes a *prima facie* case of wrongdoing . . . and the respondent seeks to rebut that showing with a claim of institutional need." Based upon their findings and conclusions, the Trustees determined that there was "no basis for recommending that the Chancellor's disposition of Dr. Zimmerman's grievance be reversed."

On 16 April 1997 petitioner sought review by the University of North Carolina's Board of Governors (Board of Governors). He claimed that (1) he was entitled to 365 days notice of nonreappointment, (2) ASU's grievance process was "fatally flawed" in that Chancellor Borkowski had made "critical rulings" regarding "his own

conduct and representations," and (3) the Trustees' determination that petitioner had failed to present a *prima facie* case of wrongdoing was "clearly erroneous."

The Board of Governors' Committee on Personnel and Tenure reviewed the record to determine whether petitioner's appeal merited action by the Board of Governors. The committee's report addressed the issues raised by petitioner. Their findings and conclusions may be summarized as follows:

> 1. Required notice: The committee concurred with the findings of the FGHC, Chancellor Borkowski, and the Trustees, that at the time of his nonreappointment, petitioner was a tenure-track assistant faculty member entitled to 180 days notification.

> 2. Chancellor's role in review process: The committee found that (a) administrators' review of their own decisions "is inherent in any institutional grievance process," and did not justify reversal without some proof of bias, (b) the FGHC's findings did not personally attack Chancellor Borkowski, (c) Chancellor Borkowski had accepted the FGHC's findings on "all procedural points," and (d) the Trustees had conducted their own review.

> 3. Personal malice. The committee stated that their standard of review for evidentiary issues focuses on the consistency of decision-makers below, that further review is appropriate if there has been disagreement, and that neither the FGHC, Chancellor Borkowski, nor the Trustees "found such a contention [of personal malice] established."

Upon these findings, the Committee on Personnel and Tenure concluded that further review by the Board of Governors was not appropriate. On 12 September 1997, the Board of Governors received and approved the report of the committee, and held that it would "decline to entertain this appeal further, and leave undisturbed the decision below."

From the decision of the Board of Governors, petitioner on 15 October 1997 appealed to the superior court for judicial review. Respondents filed a motion to dismiss on 20 November 1997, alleging that petitioner had failed to "explicitly state what exceptions are taken to the decision or procedure," as required by N.C.G.S. § 150B-46. The motion to dismiss was denied, and an amended petition for judicial review was filed on 28 February 1998. Issues raised in the amended petition can be summarized as follows:

1. Notice: petitioner argued he was entitled to 365 days notice.

2. Chancellor's role: petitioner argued that Chancellor Borkowski's role in reviewing the FGHC's findings violated petitioner's state and federal right to due process.

3. Personal malice: petitioner asserted error in the Board of Governors's findings and conclusions on this issue.

4. Petitioner argued that the Board of Governors violated provisions of its Code by denying his request for review.

5. Petitioner alleged that "based upon the whole record, the decision below is arbitrary and capricious[.]"

The trial court's order was entered 15 August 2000. The trial court did not rule on petitioner's claim that Chancellor Borkowski had "made critical findings regarding his own conduct," and concurred with the FGHC, Chancellor Borkowski, the Trustees, and the Board of Governors, that petitioner was entitled to 180 days notice of reappointment, and that petitioner had failed to establish the existence of personal malice. The trial court also held that the Board of Governors's decision not to grant review to petitioner was (a) arbitrary and capricious, and (b) in violation of petitioner's right to substantive due process, and (c) "infected by" errors of law. On this basis, the court ordered petitioner reinstated as a full professor at ASU, and awarded his costs. Respondents appealed from this order, and from the denial of their motion to dismiss petitioner's motion for judicial review. Petitioner appealed the trial court's denial of his request to be awarded back pay.

## Standard of Review

The trial court's order was entered pursuant to petitioner's appeal from a final agency decision, in this case the decision by the Board of Governors denying further review of his grievance against ASU. Judicial review of a final agency decision is governed by N.C.G.S. § 150B-51(b) (1999), "Scope of review:"

    (a) [T]he court reviewing a final decision may affirm the decision of the agency or remand the case for further proceedings. It may also reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30 . . . in view of the entire record as submitted;

or

(6) Arbitrary or capricious.

The standard of review employed by the reviewing court is determined by the type of error asserted; errors of law are reviewed *de novo*, while the "whole record" test is applied to allegations that the administrative agency decision was not supported by the evidence, or was arbitrary and capricious. *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 443 S.E.2d 114 (1994). "*De novo* review requires a court to consider the question anew, as if the agency has not addressed it." *Blalock v. N.C. Dep't of Health and Human Servs.*, 143 N.C. App. 470, 475-76, 546 S.E.2d 177, 182 (2001). Under the whole record test, "the reviewing court [must] examine all competent evidence (the 'whole record') in order to determine whether the agency decision is supported by 'substantial evidence.' " *ACT-UP Triangle v. Commission for Health Services*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (quoting *Amanini*, 114 N.C. App. at 674, 443 S.E.2d at 118). Substantial evidence is " 'more than a scintilla' and is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams v. N.C. Dep't of Env't & Natural Res.*, 144 N.C. App. 479, 483, 548 S.E.2d 793, 796 (2001) (quoting *Lackey v. Dept. of Human Resources*, 306 N.C. 231, 238, 293 S.E.2d 171, 176 (1982)). However, the whole record test "does not permit the court 'to replace the [agency's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*,' " *N.C. Dept. of Correction v. McNeely*, 135 N.C. App. 587, 592, 521 S.E.2d 730, 733 (1999) (quoting *Thompson v. Board of Education*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977)); but "merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." *Dept. of Correction v. Gibson*,

58 N.C. App. 241, 257, 293 S.E.2d 664, 674 (1982), *rev'd on other grounds*, 308 N.C. 131, 301 S.E.2d 78 (1983). If the agency's findings are supported by substantial evidence, they must be upheld. *Id.* On appeal:

> On review of a superior court order regarding a board's decision, this Court examines the trial court's order for error of law by determining whether the superior court: (1) exercised the proper scope of review, and (2) correctly applied this scope of review. . . . Further, this Court determines the actual nature of the contended error and then proceeds with an application of the proper standard of review.

*Tucker v. Mecklenburg Cty. Zoning Bd. of Adjust.*, 148 N.C. App. 52, 55-56, —— S.E.2d ——, —— (2001).

In its order regarding an agency decision, the trial court should state the standard of review it applied to resolve each issue. *In re Appeal of Willis*, 129 N.C. App. 499, 500 S.E.2d 723 (1998). In the instant case, the trial court set out generally the standards that it would apply to the issues before it. Although in several instances the trial court did not explicitly state the standard employed in its review of a specific issue, we can discern from the record which standard of review was applied. Review by this Court is further complicated by the organization of the trial court's order. The order contains three sections: "findings of fact," "operative findings of fact," and "conclusions of law." Certain of the findings of fact and "operative" findings of fact should properly be labeled conclusions of law. *See Wilder v. Wilder*, 146 N.C. App. 574, 553 S.E.2d 425 (2001) (finding of fact that states no factual basis is actually a conclusion of law). In *State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. 344, 358 S.E.2d 339 (1987), the Court stated:

> Findings of fact are statements of what happened in space and time. These facts, when considered together, provide the basis for concluding, as the Commission did here, whether an action or decision was reasonable or prudent. . . . In this case, [in] the Commission's summary of evidence, findings of fact and conclusions of law are mixed together . . . . Proper labeling might have made this Court's task a little easier, but we nonetheless have been able to separate facts from conclusions in examining appellants' various assignments of error.

*Id.* at 352, 358 S.E.2d at 346.

We will review conclusions of law *de novo* regardless of the label applied by the trial court. *Carpenter v. Brooks*, 139 N.C. App. 745, 752, 534 S.E.2d 641, 646, *disc. review denied*, 353 N.C. 261, 546 S.E.2d 91 (2000) (conclusions of law, even if erroneously labeled as findings of fact, are reviewable *de novo* on appeal; Court "not bound by the label used by the trial court"); *State v. Rogers*, 52 N.C. App. 676, 681-82, 279 S.E.2d 881, 885 (1981) ("[f]indings of fact that are essentially conclusions of law will be treated as such upon review," and will be "upheld when there are other findings upon which they are based").

I.

**[1]** Respondents argue that the trial court erred in its interpretation of relevant agency regulations. We agree.

The FGHC, Chancellor Borkowski, the Trustees, and the Board of Governors concurred that the Provost acted within his authority when he made the decision regarding petitioner's reappointment. The trial court, however, disagreed, and held in its order that "ASU regulations unequivocally state that the decision not to reappoint 'shall be made by the dean' . . . [t]hus, ASU has governing regulations that require the nonreappointment decision not be left to the unchecked whim of the administration." The issue before this Court is whether the Provost had authority to override the dean's recommendation of reappointment. The resolution of this question requires our interpretation of ASU regulations, and thus is reviewed *de novo*.

We first examine the overall nature and extent of ASU administrators' authority. "The Chancellor and the UNC-CH Board of Trustees derive their authority from the Board of Governors of the University of North Carolina (UNC) which, in turn, derives its authority from N.C. Gen. Stat. § 116-11(2) (1994) and Article IX, Section 8 of our North Carolina Constitution." *DTH Publishing Corp. v. UNC-Chapel Hill*, 128 N.C. App. 534, 539, 496 S.E.2d 8, 11, *disc. review denied*, 348 N.C. 496, 510 S.E.2d 382 (1998). Under N.C.G.S. § 116-11(2) (1999), the Board of Governors "is responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions." Pursuant to this statutory authority, the Board of Governors has created The Code of the Board of Governors (the Code), which contains regulations applicable to all UNC campuses, including ASU. Code Appendix, § I.A.2, delegates to UNC Chancellors the authority to make recommendations for employment of faculty members, which recommendations must be forwarded to

the Trustees for approval. We conclude, therefore, that the Chancellor and Provost of ASU generally have authority to make employment decisions regarding faculty members.

Further, our interpretation of ASU regulations convinces us that the Provost has the specific power to overrule a dean's recommendation of reappointment. ASU rules and procedures governing reappointment of tenure-track faculty members are set out in § 3.6.3 and § 3.6.4 of the ASU faculty handbook. "Reappointment, Promotion, and Tenure" is addressed in § 3.6.3, which states in relevant part the following:

> b. A faculty member who is to be considered for reappointment . . . must be notified by the department chairperson . . . [and] may submit to the chairperson materials . . . and may appear before the committee to speak to the issue. The committee shall consider all materials submitted. . . .

> c. The department chairperson shall give the dean of the particular college his or her written recommendations on . . . the faculty member being considered for reappointment. . . . The dean of the college shall attach her or his recommendation and then forward all material to the Provost. . . . **If the personnel action involves a reappointment and the Provost . . . concurs with the recommendation, a notice of reappointment shall be sent to the faculty member.** . . . If the Chancellor decides not to recommend a personnel action favorable to the faculty member, the Chancellor shall convey that decision to the faculty member[.] (emphasis added)

Petitioner, however, has relied on language in another ASU faculty handbook section, § 3.6.4, "Nonreappointment of Faculty Members of Probationary Term Appointments" to support his contention that the Provost has no authority to override the dean's recommendation of reappointment. This section states, in relevant part:

> 3.6.4.B. The decision not to reappoint . . . shall be made by the dean of the appropriate college[,] . . . after the dean has received the recommendations of the Departmental Personnel Committee and the department chairperson. This decision is final except as it may later be reviewed in accordance with the provisions of Chapter IV. Before such decision is communicated to the faculty member, the decision shall be communicated for information to the Provost. . . .

Thus, under § 3.6.4.B, if the dean rejects a particular faculty member, the decision "is final," and is only communicated to the Provost "for information." The significance of the finality of a dean's non-reappointment decision is that a college may not be compelled to reappoint or promote a faculty member after the dean has rejected the candidate. This finality is not part of § 3.6.3.c, which provides for notice to the faculty member of his reappointment if "the Provost . . . concurs with the recommendation[.]" This language clearly contemplates situations in which the Provost does not concur. We conclude that, although senior administrators may not overrule the dean's recommendation of nonreappointment, and force the college to accept a candidate, they may overrule the dean's decision to reappoint, if it appears to be in the overall best interests of the university. This is consistent with the obligation of senior administrators to consider "institutional needs and resources" in making personnel decisions.

In the instant case, petitioner's department personnel committee recommended reappointment, as did his department chair. The dean accepted their recommendation, and forwarded a reappointment recommendation to the Provost, all in compliance with the procedures described in § 3.6.3. We conclude that because the dean recommended reappointment, rather than nonreappointment, it is § 3.6.3, rather than § 3.6.4, which governs the present situation; the dean recommended reappointment, but the Provost did not "concur with the recommendation."

This Court concludes that the Provost had the authority to decide not to reappoint petitioner, and further concludes that the trial court erred in its conclusion that the Provost and Chancellor Borkowski "exceeded their power when they rejected the recommendation of the dean." We hold that the trial court erred in its interpretation of relevant agency regulations on this issue.

II.

[2] Respondents next allege that the trial court erred in its application of the whole record test to other issues. We agree.

In the instant case, the trial court concluded, based upon its review of the whole record, that "the [Board of] Governors' decision not to review the findings of the Trustees and the FGHC is not only arbitrary and capricious, but also violates Dr. Zimmerman's substantive due process rights[, and was] . . . infected with errors of law[.]"

We will, therefore, examine the Board of Governors' decision, to determine if the trial court correctly applied the whole record test in reaching this conclusion.

The trial court's review of the Board of Governors' decision not to hear petitioner's appeal was the fifth level of appeal by petitioner from his nonreappointment. The earlier stages of ASU's grievance process are summarized below:

1. The FGHC conducts a hearing to determine if a preponderance of the evidence establishes that a right or entitlement, conferred by university policy or state or federal laws, was abridged.

2. Chancellor Borkowski reviews the FGHC recommendations, but makes the final decision on a personnel matter.

3. The Trustees review the record to determine if Chancellor Borkowski's decision not to grant relief to petitioner was "clearly erroneous."

4. The Board of Governors examines the record to determine if significant procedural or substantive errors below require review.

ASU faculty handbook § 4.6.4 confers jurisdiction upon FGHC to conduct hearings only upon "those matters specified in the request for a hearing." In the present case, the FGHC made findings regarding each of petitioner's contentions, and held against him on all. Their findings and conclusions addressed the factual issues regarding (1) petitioner's faculty status at the time he received notice of nonreappointment, (2) length of required notice of nonreappointment, and (3) significance of any procedural defects in the notice of nonreappointment. The FGHC's findings on the issues that petitioner "specified in the request for a hearing" were accepted by Chancellor Borkowski, and subsequently ratified by the Trustees, the Board of Governors, and the trial court. Our review of the record reveals that these findings were supported by substantial evidence, and thus could not properly form the basis of the trial court's conclusion that the Board of Governors' decision was arbitrary and capricious. Indeed, as indicated, the trial court concurred on each of the issues outlined in petitioner's request for an FGHC hearing.

However, notwithstanding petitioner's failure to establish any of his stated grievances, the FGHC concluded that petitioner had made a *prima facie* case of wrongful nonreappointment. Its recommendation stated that where the dean's recommendation of reappointment

is "overturned on the basis of administrator judgments of institutional need, a *prima facie* case has been established." The trial court agreed with this, stating in its order that the following evidence constituted a *prima facie* showing: (1) petitioner applied for reappointment, (2) was qualified for the position, (3) was recommended for reappointment by his department chair and the dean of his college, but (4) petitioner was not reappointed. The trial court concluded that upon this evidence, ASU "was then required to put forth a legitimate reason to justify its nonreappointment of Dr. Zimmerman." We disagree with this conclusion.

University regulations require decisions regarding reappointment and nonreappointment to be made within the following parameters:

1. The decision "may be based on any factor(s) considered relevant to the total institutional interests[.]"

2. Decision makers "must consider the faculty member's demonstrated professional competence, potential for future contributions, and institutional needs and resources.

3. The decision "may not be based upon [a] the faculty member's exercise of rights guaranteed by either the First Amendment to the United States Constitution or Article I of the North Carolina Constitution, [b] discrimination based upon the faculty member's race, color, religion, sex, age, handicap, or national origin, or [c] personal malice."

ASU faculty handbook, § § 3.6.3 and 3.6.4. A *prima facie* case of wrongful nonreappointment requires that "the evidence presented by the faculty member is sufficient, alone and without rebuttal" to establish that "some right or entitlement, conferred by university policy or state or federal laws was abridged to the faculty member's detriment, by the policy or action of the respondent." ASU faculty handbook § 4.6.1.

In the instant case, the evidence established only that petitioner was a tenure-track professor who, despite the recommendation of his dean, was not reappointed. Petitioner's basic contention is that, inasmuch as he was qualified and had been recommended by his department, his nonreappointment should be presumed to be based upon a violation of law, or some impermissible consideration. This flies in the face of the language of the ASU faculty handbook, which states that the decision may be based on any relevant factor, other than the

three impermissible considerations stated in § § 3.6.3 and 3.6.4 of the handbook. Petitioner did not allege that he was the victim of discrimination, or that his First Amendment rights had been abridged. Nor did he demonstrate the existence of personal malice; on this issue, the trial court was in agreement with the Trustees and the Board of Governors.

On this record, Chancellor Borkowski, the Trustees, and the Board of Governors all concluded that petitioner had not made out a *prima facie* case. However, despite petitioner's failure to establish that his nonreappointment had been based upon one of the three impermissible grounds, the trial court nevertheless concluded that he had made out a *prima facie* case. On this question, the trial court's reliance on FGHC's conclusion that a *prima facie* case had been established is misplaced. The FGHC's factual conclusions are not herein disputed, for as noted by the trial court, the FGHC was "the only body to hear and determine the credibility of witnesses and facts." However, the existence of a *prima facie* case requires legal analysis as well as fact finding, and thus must be carefully reviewed. We conclude that the petitioner failed to establish a *prima facie* case, and that the trial court misapplied the whole record test when it reached a contrary conclusion.

[3] Upon review of the whole record, including the transcript of the FGHC hearing, we hold that, with the exception of the FGHC's erroneous conclusion that petitioner had presented a *prima facie* case, the findings and conclusions of the FGHC, Chancellor Borkowski, the Trustees, and the Board of Governors regarding the issues raised by petitioner in his application for a FGHC hearing, and on the issue of personal malice, were supported by substantial evidence. We further conclude that at each level of university appeal the correct standard of decision-making and review was applied, and that the Board of Governors' decision to leave undisturbed the decision of the Trustees was based upon its conclusions. For these reasons, we reverse the trial court's conclusion that the decision of the Board of Governors denying further review of petitioner's case was arbitrary and capricious, affected by errors of law, and in violation of his right to substantive due process.

For the reasons discussed herein, we conclude that the trial court erred in its conclusions that (1) the Provost lacked authority to decide whether petitioner would be reappointed, (2) petitioner had made a *prima facie* case that he had been wrongfully nonreappointed, and (3) that the Board of Governors' denial of further review

of petitioner's appeal was arbitrary and capricious, and "infected with" errors of law. Accordingly, we reverse the trial court's order, and remand for reinstatement of the Board of Governors' decision not to review petitioner's appeal.

Having reversed the trial court's order, we have no need to address respondents' appeal from the trial court's interlocutory order, nor petitioner's cross-appeal.

Reversed.

Judges McGEE and TIMMMONS-GOODSON concur.