DR. YAN-MIN WANG, Petitioner v. UNC-CH SCHOOL OF MEDICINE and
DR. WILLIAM SNIDER, Respondents

No. COA10-1021

(Filed 4 October 2011)

**1. Public Officers and Employees—Whistleblower Act—EPA non-faculty employee**

A *de novo* review revealed that the trial court did not err when it concluded that the Whistleblower Act applied to petitioner, an EPA non-faculty employee.

**2. Public Officers and Employees—Whistleblower Act—sufficiency of findings of fact**

Although the trial court properly determined that petitioner was entitled to the protections of the Whistleblower Act, it erred by proceeding to determine that petitioner had been subjected to impermissible employment-related retaliation instead of remanding this issue to the Board of Governors (BOG) for appropriate findings of fact. The case was remanded to the superior court for further remand to the BOG.

**3. Public Officers and Employees—doctor—failure to show gender, age, and national origin discrimination**

The trial court erred by reversing the Board of Governors' (BOG) finding that a doctor had not discriminated against petitioner on the basis of her gender, age, and national origin. However, a remand was not necessary because there was competent, material, and substantial evidence in the record to support the BOG's decision.

**4. Constitutional Law—due process—equal protection**

The trial court erred by concluding that petitioner established the existence of valid due process or equal protection claims.

Judge ELMORE concurring in part, concurring in result in part, and dissenting in part in separate opinion.

Appeal by respondents from order entered 14 May 2010 by Judge Abraham Penn Jones in Orange County Superior Court. Heard in the Court of Appeals 9 February 2011.

*Alan McSurely for petitioner.*

*Attorney General Roy Cooper, by Special Deputy Attorney General Gary R. Govert for respondents.*

ERVIN, Judge.

Respondents UNC-Chapel Hill School of Medicine and Dr. William Snider appeal an order reversing a decision of the Board of Governors of the University of North Carolina to the effect that Petitioner Dr. Yan-Min Wang had not been treated in an impermissible and unlawful manner in connection with her employment and ordering UNC-Chapel Hill to reinstate Petitioner to a position she previously held with the university, to pay Petitioner's attorney's fees, and to revise its grievance procedures. On appeal, Respondents argue that the trial court misapplied the whole record test in evaluating the BOG's decision, erred reviewing the constitutional and other legal issues raised by Petitioner, and erred by reversing the BOG's decision. After careful consideration of Respondents' challenges to the trial court's order in light of the record and the applicable law, we affirm the trial court's order in part and reverse and remand the trial court's order in part.

## I.  Factual Background

### A.  Substantive Facts

On 1 August 2004, Dr. William Snider, the director of the Neuroscience Center at the UNC-Chapel Hill School of Medicine, appointed Petitioner to a part-time position as a research scientist. Dr. Snider leads a team that conducts experiments on the nerve processes of genetically modified mice. The funding necessary to support this work comes from grants provided by the National Institutes of Health and private foundations. Petitioner was initially appointed for a one year term, with her employment contingent upon the continued availability of the necessary funding and subject to the need for compliance with the University's Employment Policies for EPA Non-Faculty Employees. In an e-mail sent prior to Petitioner's appointment, Dr. Snider stated that, "if things go well" and the needed funding became available, Petitioner might obtain a full-time appointment as a non-tenure track research assistant professor in the future.

On 27 April 2005, Dr. Snider submitted an application for a "reentry" grant from the NIH to fund Petitioner's position as a full-time research assistant professor. On 1 August 2005, while the grant appli-

cation was still pending, Petitioner was appointed to a second one-year term as a part-time research scientist.

After her reappointment, Petitioner worked for Dr. Snider on a separate funding proposal involving the provision of support for Dr. Snider's work using a line of experimental mice. As part of that process, Petitioner conducted preliminary genotyping tests on the mice[1] used in the lab's experiments for the purpose of confirming that the mice in question were islet1-Cre positive as had been reported in the funding proposal. As a result of the tests that she performed, Petitioner concluded that the mice were not all islet1-Cre positive, a finding that she reported to Dr. Snider. Although the evidence concerning the extent to which there actually were any genotyping problems in the laboratory and what, if any, steps needed to be taken to identify and solve any genotyping problems was conflicting, the record indicates that, in early December 2005, Petitioner and Dr. Snider exchanged a series of e-mails in which they disputed the appropriateness of the tone that each had used in communicating with other during various conversations concerning the genotyping issue and the specifics of what each had said to the other during these conversations.

On 12 December 2005, Dr. Snider learned that the NIH grant had been approved. In January 2006, Dr. Snider sent e-mails to Petitioner stressing the importance that the level of collegiality that she displayed while interacting with others would play in his decision concerning whether to reappoint Petitioner to another term of employment. On 31 January 2006, Dr. Snider informed Petitioner that he had decided not to recommend her for a research faculty appointment due to concerns about her tendency to make "intemperate comments" and engage in "harsh interactions." However, Dr. Snider told Petitioner that, if she could "interact productively around the science," he would set up a "mentoring committee" that would monitor Petitioner's progress and advise him "if and when it is appropriate to make the research faculty appointment."

In February 2006, Petitioner met with Denise Vandervort, a human relations facilitator, for the purpose of expressing her concerns about Dr. Snider's decision to refrain from recommending her for appointment to a full-time position. After discussing the matter with Petitioner and Dr. Snider, Ms. Vandervort and Dr. Snider "agreed that any further interactions between [Dr. Snider and Petitioner]

---

1. Genotyping is a process used to identify the specific genetic characteristics of genetically altered mice.

should take place in the presence of a third party" and created a mentoring committee for the purpose of assisting in the resolution of the various issues that surrounded Petitioner's employment. On 24 March 2006, the mentoring committee presented Petitioner with a "memorandum of understanding" detailing the terms under which she would be allowed to continue to work at the Center. However, Petitioner did not sign the MOU because she did not agree with its terms.

On 31 March 2006, Petitioner met with Karen Silverburg, the Associate Dean of Human Resources, for the primary purpose of discussing her contention that Dr. Snider had "promised" to promote her to a full-time position. Although Plaintiff asserts in her brief before this Court that she "mentioned" problems with the mouse colony during this meeting, the record contains no indication that issues concerning laboratory procedures were addressed at that time.

In late March and early April, 2006, Petitioner wrote a letter (referred to as the "Dear Dr." letter) in which she complained about Dr. Snider's "broken promises" to hire her as a full-time researcher. In addition, the "Dear Dr." letter included a paragraph discussing Petitioner's concerns about mouse genotyping in Dr. Snider's lab. Petitioner e-mailed or gave this letter to Dr. James Anderson and Dr. Colin Hall, the chairs of the two departments in which Dr. Snider had an appointment; Associate Dean Karen Silverberg; Dr. Albert Collier, the University's Scientific Integrity Officer; Wayne Blair and Dr. Laurie Mesibov, the University's ombudsmen; and Dr. Anthony-Sam Lamantia, a professor in the Neurosciences Center and one of Dr. Snyder's colleagues. According to applicable University policies, Drs. Anderson, Hall, Collier and Mesibov and Mr. Blair were faculty members or administrators to whom a complaint could appropriately be directed. However, Petitioner should not, under established University policy, have sent the "Dear Dr." letter to Dr. Lamantia. After learning that Petitioner had sent a copy of the "Dear Dr." letter to Dr. Lamantia, Dr. Snider decided that he could not work with Petitioner any longer. As a result, on 13 April 2006, Dr. Snider rejected the funding from the NIH grant which would have been used to employ Petitioner in a full-time position, instructed Petitioner to work at an off-campus site for the remainder of her contract, and notified Petitioner that she would not be reappointed.

B. Procedural History

On 23 April 2006, Petitioner filed a grievance with the EPA Non-Faculty Grievance Committee in which she alleged that Dr. Snider

WANG v. UNC-CH SCH. OF MED.

[216 N.C. App. 185 (2011)]

had failed to renew her appointment in retaliation for her decision to report his "broken promises" to promote her to a full-time position and the problems with mouse genotyping in his lab. On 1 June 2006, the Grievance Committee reported to Chancellor James Moeser that it had found "no basis to determine that Dr. Snider has engaged in unfair or retaliatory treatment toward the grievant or to other employees." Petitioner appealed the Grievance Committee's decision to the Chancellor, who rejected her appeal on 22 August 2006. At that point, Petitioner appealed to the Board of Trustees. On 20 December 2006, the BOT's Grievance Panel remanded Petitioner's grievance to the Grievance Committee in order to permit that body to make detailed factual findings concerning Petitioner's grievance on the basis of a *de novo* review of the record and recommended that Petitioner be permitted to submit a new grievance.

On 25 February 2007, Petitioner submitted a new statement of her grievances in which she asserted four claims:

1.) On April 13, 2006, Dr. Snider gave me a signed letter informing me that I was to [work off campus for the rest of my appointment.] This action was in retaliation for reports I had made about him to appropriate University administrative officials starting in late March, 2006 . . . concern[ing] matters governed by . . . University policy and [the Whistleblower Act.]

2.) On April 13, 2006 in the same letter Dr. Snider informed me that my contract would not be renewed and that my reentry grant would be returned to NIH. This action was in retaliation for reports I had made about him to appropriate University administrative officials starting in late March, 2006 . . . concern[ing] matters governed by . . . University policy and [the Whistleblower Act.]

3.) During the entire period of my employment in his lab, Dr. Snider discriminated against me on the basis of my age (48), sex (female), and national origin (Chinese).

After identifying the issues that it needed to address in order to resolve Petitioner's grievance, the Grievance Committee reviewed documentary evidence, interviewed witnesses and conducted a hearing at which Petitioner and Dr. Snider presented their respective contentions. On 21 May 2007, the Grievance Committee issued a report concluding that it could not "find in favor of any of Dr. Wang's claims."

On 4 June 2007, Petitioner appealed the Grievance Committee's decision to the Chancellor. On 10 October 2007, Chancellor Moeser

rejected Petitioner's appeal. Petitioner appealed the Chancellor's determination to the BOT, which rejected Petitioner's appeal by means of a letter dated 26 February 2008. Petitioner appealed the BOT's decision to the BOG on 11 July 2008.

On 8 January 2009, the BOG's Committee on Personnel and Tenure submitted a report addressing Petitioner's allegations. The report was adopted by the BOG as its decision on the following day. In its decision, the BOG considered Petitioner's arguments on a *de novo* basis. In response to Petitioner's contention that she had been subjected to impermissible discrimination stemming from her age, sex, and national origin, the BOG concluded that, "based upon all of the evidence in the record and the legal precedents," Petitioner had "failed to carry her burden of demonstrating that she was discriminated against." Moreover, the BOG concluded that, given her status as an EPA Non-Faculty employee, Petitioner was not protected by the Whistleblower Act and that Petitioner was not entitled to relief on First Amendment grounds. In addition, the BOG stated that:

> Although we conclude that Dr. Wang does not have an appeal to this Board for retaliation under the whistleblower statute or the First Amendment, we note that the Record on Appeal does not show retaliation by Dr. Snider under either basis. It shows two people who simply could not get along, and a supervisor who finally reached the breaking point and ended the relationship.

Finally, the BOG concluded that:

> in this appeal, Dr. Wang did not meet her burden of proving discrimination or retaliation. She did not show that discrimination or retaliation were the reasons she was not reappointed, the grant application was withdrawn, and/or she was barred from the lab. . . . Therefore, the Committee recommends that the Chancellor's decision not to reappoint should be affirmed.

On 9 February 2009, Petitioner filed a petition seeking judicial review of the BOG's decision in the Orange County Superior Court. In her petition, Petitioner asserted that the BOG had erred in a number of respects, including allegations that:

> 1. The BOG erred by ruling that, as an EPA Non-Faculty employee, Petitioner was not protected by the Whistleblower Act.

> 2. The BOG erred by rejecting Petitioner's claim to the protection of the First Amendment and analogous provisions of the North Carolina Constitution.

3. The BOG erred in its reliance on and interpretation of case law and its analysis of salaries paid to other employees in connection with its consideration of Petitioner's discrimination claims[.]

4. The BOG erred by denying Petitioner's request for copies of CD recordings of the witness interviews conducted in connection with the Grievance Committee's investigation.

5. The BOG erred in its analysis of Petitioner's retaliation and discrimination claims by failing to subject the record evidence to "a pretext or mixed motive analysis."

6. The applicable grievance procedures, on their face and as applied to Petitioner, "violated Petitioner's Constitutional rights under Article I of the North Carolina Constitution, particularly Sections 18 and 19, which provide for timely hearings and guaranteeing that the state will provide equal protection and the law of the land to all citizens, which includes the right to a fair, impartial hearing."

In addition, Petitioner asserted that the BOG's decision was arbitrary and capricious and rested upon a misapplication of the applicable law.

Petitioner's petition came on for hearing before the trial court at the 25 January 2010 civil session of Orange County Superior Court. On 14 May 2010, the trial court entered an order reversing the BOG and ruling that:

1. Petitioner, an EPA Non-Faculty employee, was protected by the Whistleblower Act.

2. Dr. Wang's distribution of the "Dear Dr." letter was protected activity, and was "a substantial or motivating factor" in Dr. Snider's decision not to renew her contract.

3. The BOG "arbitrarily and capriciously mis-stated and mis-applied the appropriate law" to the evidence concerning Petitioner's claims under the Whistleblower Act by failing to "subject the evidence to the pretext and mixed motive analyses."

4. The BOG violated Petitioner's rights under the North Carolina Constitution by failing to provide her with transcripts of its interviews with witnesses.

5. The applicable grievance procedures, which afford more procedural rights to career State employees who challenge the existence of just cause for an adverse employment action than to

EPA Non-Faculty employees who file a grievance alleging discrimination or retaliation, violated Petitioner's rights to due process and equal protection.

Based upon these determinations, the trial court ordered the UNC School of Medicine to "reinstate, Petitioner in a comparable position with retroactive pay and benefits that she would now be entitled to as if she had been employed since the University banned her from her workplace[,] . . . reimburse her reasonable attorney's fees and costs[,] . . . bring the University's unconstitutional Grievance Procedure into compliance consistent with this Decision and Order, and . . . make available to all parties . . . all testimonial evidence adduced in any grievance[.]" Respondents noted an appeal to this Court from the trial court's order.

## II.  Legal Analysis

## A.  Standard of Review

According to N.C. Gen. Stat. § 150B-43, "[a]ny person who is aggrieved by the final decision in a contested case, and who has exhausted all administrative remedies made available to him by statute or agency rule, is entitled to judicial review of the decision." N.C. Gen. Stat. § 150B-51(b) authorizes a trial court to reverse or modify an agency's decision if the petitioner's substantial rights have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:

(1)  In violation of constitutional provisions;

(2)  In excess of the statutory authority or jurisdiction of the agency;

(3)  Made upon unlawful procedure;

(4)  Affected by other error of law;

(5)  Unsupported by substantial evidence admissible under [N.C. Gen. Stat. §§] 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6)  Arbitrary, capricious, or an abuse of discretion.

"On judicial review of an administrative agency's final decision, the substantive nature of each assignment of error dictates the standard of review." *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 658, 599 S.E.2d 888, 894 (2004).

The first four grounds are "law-based" inquiries warranting *de novo* review. The latter two grounds are "fact-based" inquiries warranting review under the whole-record test. Under *de novo* review, a court "considers the matter anew[] and freely substitutes its own judgment for the agency's." Under the whole-record test, a court "examines all the record evidence . . . to determine whether there is substantial evidence to justify the agency's decision."

*Trayford v. N.C. Psychology Bd.*, 174 N.C. App. 118, 121, 619 S.E.2d 862, 863-64 (2005) (quoting *Carroll*, 358 N.C. at 659-60, 599 S.E.2d at 894-95), *aff'd*, 360 N.C. 396, 627 S.E.2d 462 (2006). "As to appellate review of a superior court order regarding an agency decision, 'the appellate court examines the trial court's order for error of law. The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly.' " *ACT-UP Triangle v. Commission for Health Servs.*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (quoting *Amanini v. N.C. Dep't of Human Resources*, 114 N.C. App. 668, 675, 443 S.E.2d 114, 118-19 (1994)). In reviewing "an agency decision, the trial court should state the standard of review it applied to resolve each issue." *Zimmerman v. Appalachian State Univ.*, 149 N.C. App. 121, 130, 560 S.E.2d 374, 380 (2002) (citing *In re Appeal of Willis*, 129 N.C. App. 499, 502, 500 S.E.2d 723, 726 (1998)).

### B. Whistleblower Act

#### 1. Applicability

**[1]** N.C. Gen. Stat. Chapter 126, Article 14, §§ 126-84-88, which is commonly known as the "Whistleblower Act," protects State employees who report serious misconduct to their superiors or other appropriate authorities. The determination of whether EPA Non-Faculty employees such as Petitioner are protected by the Whistleblower Act requires interpretation of the relevant statutory provisions. "Questions of statutory interpretation are ultimately questions of law for the courts and are reviewed *de novo*." *In re Summons of Ernst & Young*, 363 N.C. 612, 616, 684 S.E.2d 151, 154 (2009) (citing *Brown v. Flowe*, 349 N.C. 520, 523, 507 S.E.2d 894, 896 (1998)). Thus, the appropriateness of the BOG's decision concerning the extent, if any, to which Petitioner is entitled to the protections of the Whistleblower Act is subject to *de novo* review.

According to N.C. Gen. Stat. § 126-5(a)(1), the provisions of the State Personnel Act apply to "[a]ll State employees not herein exempt."

N.C. Gen. Stat. § 126-5(c1)(8) provides that, "[e]xcept as to . . . the provisions of Articles 6 and 7 of this Chapter, the provisions of this Chapter shall not apply to . . . research staff . . . of The University of North Carolina." In the absence of another statutory provision to the contrary, N.C. Gen. Stat. § 126-5(c1)(8) clearly exempts individuals occupying Petitioner's position from the coverage of most provisions of the State Personnel Act. However, N.C. Gen. Stat. § 126-5(c5) specifically states that, "[n]otwithstanding any other provision of this Chapter, Article 14 of this Chapter shall apply to all State employees, public school employees, and community college employees." As we have previously noted, "[t]he legislative intent that the protections of this legislation apply to all state employees is clear." *Caudill v. Dellinger*, 129 N.C. App. 649, 654, 501 S.E.2d 99, 102 (1998), *aff'd in part; disc. review improvidently allowed in part*, 350 N.C. 89, 511 S.E.2d 304 (1999). For that reason, Respondents correctly concede in their brief that "[t]he BOG erred when it stated that the Whistleblower Act did not apply to [Petitioner]."

Our dissenting colleague argues, in reliance upon N.C. Gen. Stat. § 126-5(c)(1), that "the North Carolina Whistleblower Act does not apply to '[a] State employee who is not a career state employee as defined by this Chapter' " and that we should, for that reason, uphold the BOG's determination concerning the applicability of the Whistleblower Act to persons in Petitioner's position. Admittedly, as the dissent correctly notes, Petitioner is not a career State employee as defined in N.C. Gen. Stat. § 126-1.1. Although N.C. Gen. Stat. § 126-5(c)(1) does provide, in pertinent part, that "the provisions of this Chapter shall not apply to" "[a] State employee who is not a career State employee as defined by this Chapter," the language upon which our dissenting colleague relies is subject to the additional caveat set out in N.C. Gen. Stat. § 126-5(c5), which we quoted above. As used in N.C. Gen. Stat. § 126-5(c5), "notwithstanding" means "in spite of," "nevertheless," or "in spite of the fact that," depending upon whether it is used as a preposition, an adverb, or a conjunctive. *New Oxford American Dictionary* 1201 (3d ed. 2010). As a result, N.C. Gen. Stat. § 126-5(c1) essentially means that, "in spite of any other provision of this Chapter," the Whistleblower Act applies "to all State employees, public school employees, and community college employees," including Petitioner. Since the statutory language upon which our dissenting colleague relies in concluding that the protections of the Whistleblower Act is all contained within Chapter 126 of the North Carolina General Statutes, those statutory provisions are clearly "trumped" by N.C. Gen. Stat. § 126-5(c5). Our dissenting col-

league's conclusion to the effect that N.C. Gen. Stat. § 126-5(c5) "is meant to operate as a residuary, or catch-all, provision that is applicable only when the statute does not otherwise provide to the contrary" has no support in the relevant statutory language and would deprive N.C. Gen. Stat. § 126-5(c5) of any real meaning, since N.C. Gen. Stat. § 126-5(c5) would, under this interpretation, only make the protections of the Whistleblower Act available to a particular state employee in the event that some other statutory provision had the same effect. *Wilkins v. N.C. Stat. Univ.*, 178 N.C. App. 377, 380, 631 S.E.2d 221, 224 *disc. review denied*, 360 N.C. 655, 637 S.E.2d 219 (2006) (stating that, "[b]ecause the trial court's interpretation renders the [relevant statutory language] redundant and meaningless, we conclude that the trial court erred in its reading of the statute") (citing *HCA Crossroads Residential Ctrs. v. N.C. Dept. of Human Res.*, 327 N.C. 573, 578, 398 S.E.2d 466, 470 (1990)). As a result, we conclude that the trial court correctly determined that the protections of the Whistleblower Act were available to Petitioner.

### 2. Validity of Petitioner's Whistleblower Act Claim

[2] According to N.C. Gen. Stat. § 126-84, "State employees shall be encouraged to report verbally or in writing to their supervisor, department head, or other appropriate authority, evidence of activity by a State agency or State employee constituting:

(1) A violation of State or federal law, rule or regulation;

(2) Fraud;

(3) Misappropriation of State resources;

(4) Substantial and specific danger to the public health and safety; or

(5) Gross mismanagement, a gross waste of monies, or gross abuse of authority."

"[The] Whistleblower Act . . . requires a Petitioner to prove the following three essential elements by a preponderance of the evidence in order to establish a prima facie case: '(1) that the Petitioner engaged in a protected activity, (2) that the Respondent took adverse action against the Petitioner in his or her employment, and (3) that there is a causal connection between the protected activity and the adverse action taken against the Petitioner.' " *Holt v. Albemarle Reg'l Health Servs. Bd.*, 188 N.C. App. 111, 115, 655 S.E.2d 729, 732 (quoting *Newberne v. Department of Crime Control & Pub. Safety*, 359

N.C. 782, 788, 618 S.E.2d 201, 206 (2005)), *disc. review denied,* 362 N.C. 357, 661 S.E.2d 246 (2008). As a result, the ultimate inquiry required in connection with the consideration of any claim advanced in reliance upon the Whistleblower Act is whether the claimant has demonstrated that he or she engaged in protected conduct and whether any adverse treatment to which the claimant was subjected constituted retaliation for engaging in protected activities.

Petitioner's claim to have engaged in "protected activity" rests on the following language from the "Dear Dr." letter:

> . . . In late 2005 I brought to Dr. Snider's attention a very serious problem with the mouse population that his lab has been using. The mouse colony is filled with mice whose genotypes are incorrectly identified. For close to two years researchers in the lab had used these mice in their experiments without being aware of this fact. Dr. Snider asked me to leave the lab shortly after I brought this to his attention. Again, the reason he gave is "angry conversations" or the use of an "unpleasant tone." I think it is fair to say that his sensitivity to my tone of voice intensified after I brought the mouse problem to his attention.

The BOG did not make any definitive determination as to whether Petitioner engaged in any protected activity during the interval leading up to the events that underlie her complaints or whether Petitioner was subject to employment-related retaliation for engaging in that conduct. Instead, the BOG simply concluded that Petitioner was not entitled to raise a claim under the Whistleblower Act. The BOG did include a single conclusory statement in its order to the effect that Plaintiff had not shown retaliation and that the record simply revealed, instead, the existence of a personality conflict between Petitioner and Dr. Snider. However, the BOG failed to make adequate factual findings explaining what it meant by these statements, the standard that it used in reaching the conclusion that it deemed appropriate, and the facts that led it to find that no retaliation had occurred. In the absence of factual findings addressing these issues, the administrative record is simply not sufficient to permit a determination of the extent, if any, to which Petitioner's Whistleblower's Act claim has substantive merit.

Although the trial court correctly determined that Petitioner was entitled to the protections of the Whistleblower Act, it erred by proceeding to determine that Petitioner had been subjected to impermissible employment-related retaliation because of her protected

WANG v. UNC-CH SCH. OF MED.

[216 N.C. App. 185 (2011)]

activities. In essence, the trial court, in violation of the applicable standard of review, *Vanderburg v. N.C. Dept. of Revenue*, 168 N.C. App. 598, 612, 608 S.E.2d 831, 841 (2005) (stating that "[a] whole record review does not permit us to substitute our judgment for the [agency's] findings of fact") (citing *Savings & Loan Assoc. v. Savings & Loan Comm.*, 43 N.C. App. 493, 497, 259 S.E.2d 373, 376 (1979), resolved disputed questions of fact during the judicial review process instead of remanding this issue to the BOG for appropriate factual development.[2] As a result, even though the trial court correctly resolved the coverage issue, it erred in the course of addressing Petitioner's Whistleblower Act claim on the merits. Thus, the decisions of both the trial court and the BOG with respect to Petitioner's claims under the Whistleblower Act and the First Amendment[3] are reversed and the case is remanded to the BOG for the making of adequate findings and conclusions concerning the Whistleblower Act and First Amendment issues.[4] *Savings & Loan Assoc.*, 43 N.C. App. at 498, 259 S.E.2d at 376 (stating that "[r]emand for further findings was essential upon concluding that the findings of record presented an inadequate basis for review").

## C. Discrimination Claims

**[3]** On appeal, Respondents argue that the trial court erred by reversing the BOG's finding that Dr. Snider had not discriminated against

---

2. In view of our determination that the Whistleblower Act issue needs to be remanded to the BOG for findings concerning whether Petitioner engaged in protected conduct and, if so, whether she was subjected to retaliation for engaging in such conduct, we need not discuss the trial court's treatment of the merits of Petitioner's claim in any detail.

3. The same errors that are discussed in the text with respect to Petitioner's Whistleblower Act claim were committed by both the BOG and the trial court in connection with Petitioner's First Amendment claim. As a result, our decision to remand this case to the trial court for further remand to the BOG in order to allow the BOG to make appropriate findings applies to both the Whistleblower and First Amendment claims.

4. We also note that the "pretext and mixed motive" analyses upon which Petitioner relied before the trial court and this Court and which the trial court discussed in its order are applicable only in the event that Petitioner has demonstrated that she engaged in protected conduct and that a causal relationship between her protected conduct and the treatment to which she was subjected has been shown to exist. *Newberne*, 359 N.C. at 789-91, 618 S.E.2d at 206-07. Similarly, the legal implications of Petitioner's assertion that Dr. Snider effectively threatened Petitioner when he informed her that the funding for her position was contingent upon his receiving a particular grant depend upon the exact factual findings made by the administrative agency. Each of these issues can be addressed by the BOG on remand and need not detain us further on appeal.

Petitioner on the basis of her gender, age, and national origin. After carefully reviewing the record, we conclude that the trial court should have affirmed the BOG's decision with respect to this issue and erred by concluding otherwise.

In her grievance, Petitioner asserted that, as a 48 year old Chinese woman, she had been the victim of unlawful discrimination on the basis of her gender, age, and nationality during her tenure in Dr. Snider's lab. After inferring, in reliance upon *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991), that Dr. Snider's initial decision to hire Petitioner indicated that he was not biased against persons of Petitioner's age, gender, and national origin, the BOG expressly determined that Petitioner had failed to rebut this inference. More specifically, the BOG stated that:

> In addition to the inference stated above, the salary data does not support Dr. Wang's claim. The heart of Appellant's claim of sex, age, and national origin discrimination is her allegation[] of salary inequity compared with co-workers. The salary information does not support Dr. Wang's claim. . . . Dr. Wang apparently either approached Dr. Snider without any job posting, or applied for a position for which she was overqualified. The result was that Dr. Snider cobbled together a part-time salary until grant funding for her salary could be obtained. By the time funding was obtained, Dr. Wang had destroyed her relationship with him to the point that Dr. Snider was no longer willing to work with her. Dr. Snider had a legitimate nondiscriminatory reason for paying Dr. Wang only a part-time salary originally and for not wanting to continue working with her.

> Therefore, based upon all of the evidence in the record and the legal precedents, Dr. Wang failed to carry her burden of demonstrating that she was discriminated against.

> . . .

> It appears that Dr. Wang has also based her retaliation claim upon her report of sex, age, and national origin discrimination at the end of March 2006. By that time, relations were extremely strained between Dr. Wang and Dr. Snider. The *de novo* review of the Record does not show that Dr. Wang carried her burden of proving by the preponderance of the evidence that Dr. Snider retaliated against her for making a complaint of discrimination.

Based upon these findings, the BOG concluded that:

> [I]n this appeal, Dr. Wang did not meet her burden of proving discrimination or retaliation. She did not show that discrimination or retaliation were the reasons she was not reappointed, the grant application was withdrawn, and/or she was barred from the lab.

We conclude that the BOG's decision with respect to this issue should be upheld on the grounds that it has adequate evidentiary support and that the trial court's decision to the contrary should be reversed.

The trial court's discussion of Petitioner's discrimination claims consists almost exclusively of a narrative describing the record evidence from Petitioner's perspective. However, "where the findings of fact of an administrative agency are supported by substantial competent evidence in view of the entire record, they are binding on the reviewing court, and that court lacks authority to make alternative findings at variance with the agency's." *Carroll* at 663, 599 S.E.2d at 897 (citing *In re Appeal of AMP, Inc.*, 287 N.C. 547, 561, 215 S.E.2d 752, 761 (1975) (other citations omitted)). Unfortunately, that is exactly what the trial court appears to have done in this case. Instead of reviewing the record to determine whether the BOG's findings had adequate evidentiary support, the trial court, in essence, concluded that the BOG had incorrectly analyzed the facts and stated its own position concerning what the record actually established. The trial court is not, given the applicable standard of review, authorized to undertake such an independent exercise in fact-finding. Although this deficiency in the trial court's order would, standing alone, suffice to justify an appellate reversal, " 'we do not believe a remand is necessary, however, because the central issue presented . . . is whether there was competent, material, and substantial evidence to support [the BOG's] decision . . . and the entire record of the hearing is before us.' " *Sack v. N.C. State Univ.*, 155 N.C. App. 484, 493, 574 S.E.2d 120, 128 (2002) (quoting *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, 356 N.C. 1, 15, 565 S.E.2d 9, 18 (2002)). Having reviewed the BOG's findings in light of the record evidence, we hold that the BOG's determination to the effect that Petitioner failed to prove that she had been subjected to unlawful discrimination on the grounds of age, gender, or national origin or to retaliation for claiming to have been treated in that fashion had ample evidentiary support and that the trial court erred by reaching a contrary conclusion. As a result, we reverse the trial court's decision that Petitioner had been subjected to unlawful discrimination on the basis of her age, gender, or nationality

and that she had been subject to retaliatory treatment because she claimed to have been mistreated in that manner.

### D. Constitutional Claims

### 1. Nature of Petitioner's Claims

[4] In her petition for judicial review, Petitioner made a generalized allegation that the BOG's decision violated her state constitutional rights to due process and equal protection. According to Petitioner:

> . . . The University's EPA Non-Faculty Employee Grievance Procedure does not, on its face, provide for any kind of hearing, much less one with the right to counsel, to confront witnesses, to full disclosure of all evidence to all parties, and the other basic elements of the law of the land for an employee who believed she has been expelled from her workplace and then terminated because of her reports of discrimination based on her gender and national origin, or Constitution Article 1. . . . [The Grievance] Committee provides full due process procedures when a discharge for cause is alleged, but for all Grievances except Grievances Concerning Discharge for Cause, . . . no hearing is provided and the investigation of the Grievance is done by interviews of parties and witnesses, where there is no chance to confront witnesses, provide all testimonial evidence to all parties, and other fundamental aspects of due process hearings. The Procedure fails to provide even minimal due process (law of the land) rights to a state employee who has alleged discrimination or retaliation, and who believes she has lost her employment because of her allegations.

Petitioner's constitutional claims can be described as follows:

> 1. The grievance procedures available to EPA Non-Faculty employees violate her right to due process, in that these procedures do not include the right to discovery of all evidence available to the Grievance Committee, and do not provide for an adversarial hearing at which Petitioner may be represented by counsel and may cross-examine witnesses.

> 2. Career State employees who challenge the existence of just cause for termination have the right to an adversarial hearing and other due process protections, while EPA Non-Faculty employees who allege discrimination or retaliation do not have "full due process procedures." Petitioner asserts that the difference in the procedures and rights applicable to these categories of em-

WANG v. UNC-CH SCH. OF MED.

[216 N.C. App. 185 (2011)]

ployees and to their differing claims constitutes a violation of her right to equal protection.

Petitioner is not entitled to relief on the basis of either of these constitutional claims.[5]

## 2. Due Process Claim

"The Fifth Amendment to the Constitution of the United States, applied to the States through the Fourteenth Amendment, provides in pertinent part: 'No person shall . . . be deprived of life, liberty, or property, without due process of law[.]' " *Chapel Hill Title & Abstract Co. v. Town of Chapel Hill*, 362 N.C. 649, 654, 669 S.E.2d 286, 289 (2008). "At the threshold of any procedural due process claim is the question of whether the complainant has a liberty or property interest, determinable with reference to state law, that is protectable under the due process guaranty. We have consistently held that, '[n]othing else appearing, an employment contract in North Carolina is terminable at the will of either party,' and that such a contract is not a sufficient proprietary interest to require full-scale constitutional protection in the form of a pretermination hearing." *Maines v. City of Greensboro*, 300 N.C. 126, 134, 265 S.E.2d 155, 160 (1980) (citing *Bishop v. Wood*, 426 U.S. 341, 344, 96 S. Ct. 2074, 2077, 48 L. Ed. 2d 684, 690 (1976), and quoting *Presnell v. Pell*, 298 N.C. 715, 723-24, 260 S.E.2d 611, 616 (1979)).

N.C. Gen. Stat. § 126-35 affords career State employees certain procedural rights that must be honored before adverse employment actions may be taken against such employees. For example, N.C. Gen. Stat. § 126-35(a) provides that "[n]o career State employee subject to the State Personnel Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause." "Our Supreme Court

---

5. Although Petitioner alleges violations of her rights under Article I, §§ 18 and 19 of the North Carolina Constitution, she has not attempted to assert a violation of her rights under the United States Constitution. However, "[t]he words 'the law of the land' as used in section [19], Article I of the North Carolina Constitution are equivalent to the words 'due process of law' required by section 1 of the Fourteenth Amendment to the United States Constitution." *Rice v. Rigsby*, 259 N.C. 506, 518, 131 S.E.2d 469, 477 (1963) (citing *State v. Hedgepeth*, 228 N.C. 259, 266, 45 S.E.2d 563, 568 (1947), *cert. denied*, 334 U.S. 806, 68 S. Ct. 1185, 92 L. Ed. 1739 (1948)). "It is also true that the Equal Protection Clause of Article I, § 19 of the Constitution of North Carolina is functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." *White v. Pate*, 308 N.C. 759, 765-66, 304 S.E.2d 199, 203 (1983) (citing *Kresge Co. v. Davis*, 277 N.C. 654, 660, 178 S.E.2d 382, 385 (1971)). As a result of the similarity between the relevant constitutional provisions and Petitioner's failure to advance a state constitution-specific argument in her brief, we will utilize decisions under the United States Constitution and the North Carolina Constitution to analyze the validity of Petitioner's constitutional claims.

has held that, for the purpose of procedural due process, 'the North Carolina General Assembly created, by enactment of the State Personnel Act, a constitutionally protected property interest in the continued employment of career State employees.' " *Teague v. N.C. Dept. of Transp.*, 177 N.C. App. 215, 220, 628 S.E.2d 395, 399 (quoting *Peace v. Employment Sec. Comm'n*, 349 N.C. 315, 321, 507 S.E.2d 272, 277 (1998)), *disc. review denied*, 360 N.C. 581, 636 S.E.2d 199 (2006).

Petitioner, however, was employed as an EPA Non-Faculty research assistant. " 'EPA' is an abbreviation designating those employees who are exempt from the State Personnel Act. . . . [Petitioner was] exempt from the State Personnel Act . . . [and] cannot establish a property right through the State Personnel Act." *McCallum v. N.C. Coop. Extension Serv.*, 142 N.C. App. 48, 57-58, 542 S.E.2d 227, 235, *disc. review denied*, 353 N.C. 452, 548 S.E.2d 527 (2001); *see also, e.g., Privette v. University of North Carolina*, 96 N.C. App. 124, 137, 385 S.E.2d 185, 192 (1989) (holding that a research technician employed by the University lacked a property interest in continued employment and was not entitled to a pre-termination hearing). As a result, we hold that Petitioner lacked a property interest in her continued and future employment sufficient to trigger the protections of the due process clause.[6] Having reached this conclusion, we need not comment on the propriety of the procedures utilized to address Petitioner's grievance. Thus, we hold that the trial court committed an error of law by concluding that Petitioner's right to due process was violated by the applicable University procedures and by ordering that revisions be made to those procedures.[7]

### 3. Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' The United States Supreme Court has 'explained that the purpose of the equal protection

---

6. We also note that the mere fact that Petitioner was required to work from home for the last several months of her second term of employment did not result in a deprivation of Petitioner's protected rights or trigger the applicability of any due process protections.

7. Petitioner also contends that she was deprived of a protected liberty interest without due process, with this contention predicated on the assertion that, when she was directed to work from home during the last ten weeks of her term and not reappointed, she thereby suffered "public humiliation and loss of name and reputation." As a result of the fact that Petitioner neither alleged this claim in her grievance nor points to any support for this contention in the record, we hold that Petitioner failed to preserve her "deprivation of liberty" claim for judicial review or to demonstrate its validity.

**WANG v. UNC-CH SCH. OF MED.**

[216 N.C. App. 185 (2011)]

clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " Thus, while the principle of substantive due process protects citizens from arbitrary or irrational laws and government policies, the right to equal protection guards against the government's use of invidious classification schemes.

*Clayton v. Branson*, 170 N.C. App. 438, 456-57, 613 S.E.2d 259, 272 (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074-1075, 145 L. Ed. 2d 1060, 1063 (2000)), *disc. review denied*, 360 N.C. 174, 625 S.E.2d 785 (2005). "Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1, 12 (1992).

In its order, the trial court appears to have analyzed Petitioner's due process and equal protection claims jointly and concludes that the fact that career State employees have more extensive procedural and substantive statutory rights than are afforded to non-career State employees, such as EPA Non-Faculty employees like Petitioner, constitutes an equal protection violation.[8] More particularly, the trial court stated that:

> . . . The University's Procedure sets up two classifications of grievants. Class I are those employees who grieve they were discharged without just cause. For this classification, the University provides: The employee shall have the right to counsel, to present the testimony of witnesses and other evidence, to confront and cross-examine adverse witnesses, and to examine all documents and other adverse demonstrative evidence. A written transcript of all proceedings shall be kept; upon request, a copy thereof shall be furnished to the employee at the University's expense. . . .

---

8. In ruling that Petitioner's right to equal protection had been violated, the trial court discussed the fact that Petitioner was not provided with recordings of a number of witness interviews. However, Petitioner's claim that she was entitled to discovery of these recordings—or of any other specific materials in the university's possession—is based on her allegation that her due process rights were violated. Having concluded that Petitioner failed to demonstrate a property interest in her employment sufficient to demonstrate an entitlement to procedural due process protections, we necessarily find that Petitioner had no constitutional right to discovery of these recordings.

For grievants who allege they suffered injuries to their repu-
tation (liberty) and to their contract rights because of their
national origin and race, and because they have followed State
policy that encourages the reporting of wrongdoing, they are rel-
egated to the back of the grievance bus. They are second-class
grievants. The University provides them no hearing, no investiga-
tion of the Grievance except interviews of parties and witnesses,
no opportunity to confront witnesses, no requirements to provide
all evidence to all parties, and the denial of other fundamental
aspects of due process hearings.

After carefully reviewing the applicable law, we conclude that
Petitioner has failed to properly allege the existence of an equal pro-
tection violation, that the analysis employed by the trial court in
addressing the equal protection issue was fatally flawed, and that the
trial court's decision concerning this issue should be reversed.

"To establish an equal protection violation, [Petitioner] must
identify a class of similarly situated persons who are treated dissimi-
larly." *Geach v. Chertoff*, 444 F.3d 940, 945 (8th Cir. 2006) (citation
omitted). Thus, "[i]n addressing an equal protection challenge, we
first identify the classes involved and determine whether they are
similarly situated." *Matter of S.L.M.*, 287 Mont. 23, 32, 951 P.2d 1365,
1371 (1997). For that reason, Petitioner was required to show as an
integral part of her equal protection claim that similarly situated indi-
viduals were subjected to disparate treatment. *Mandell v. County of
Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (stating that "[a] Plaintiff rely-
ing on disparate treatment evidence must show that she was similarly
situated in all material respects to the individuals with whom she
seeks to compare herself"); *see also State v. Waring*, 364 N.C. 443,
490, 701 S.E.2d 615, 645 (2010) (holding that a prosecutor's decision
to strike a particular juror did not constitute an equal protection vio-
lation where the information obtained during the jury selection
process failed to establish that the two jurors were similarly situ-
ated); *Grace Baptist Church v. City of Oxford*, 320 N.C. 439, 447, 358
S.E.2d 372, 377 (1987) (holding that the adoption of a zoning ordi-
nance equally applicable to all buildings constructed after a specific
date did not result in an equal protection violation because pre-exist-
ing buildings and post-ordinance buildings were not similarly situ-
ated); *Mayfield v. Hannifin*, 174 N.C. App. 386, 397, 621 S.E.2d 243,
251 (2005) (stating that counsel for the defendant and the plaintiff are
not similarly situated with respect to their obligation to maintain the
confidentiality of a plaintiff's medical records); *State v. Davis*, 96

N.C. App. 545, 549, 386 S.E.2d 743, 745 (1989) (holding that the prosecution of a defendant who intentionally failed to pay taxes as a protest while refraining from taking such action against an individual who failed to pay taxes due to neglect did not constitute an equal protection violation since the two categories of defendants were not similarly situated); *Smith v. Wilkins*, 75 N.C. App. 483, 486, 331 S.E.2d 159, 161 (1985) (holding that drivers who move to North Carolina after their licenses have been revoked in another state are not similarly situated for equal protection purposes with drivers whose licenses have been revoked in North Carolina). Thus, in order to properly assert an equal protection violation, Petitioner was required to allege and demonstrate that she was treated differently than other similarly situated individuals in some relevant way.

Petitioner's equal protection claim seems to hinge on the fact that career State employees have more extensive procedural and substantive rights than other State employees, such as probationary, temporary, or EPA Non-Faculty employees like Petitioner.[9] However, Petitioner fails to identify a specific class of employees with whom she claims to be similarly situated, or to articulate any basis for any such claim of substantial similarity. For example, Petitioner does not allege or demonstrate that all State employees or even all University employees are "similarly situated" in some relevant respect. In addition, Petitioner has not alleged or demonstrated that similarly situated persons within the class of EPA Non-Faculty university employees have been subjected to disparate treatment. At bottom, "[Petitioner has] not identif[ied] any 'classification' upon which [she] was denied equal protection" or "allege[d] that the [rights afforded to different classes of employees] included the use of any inherently suspect criteria, such as race, religion, or disability status." *Clayton*, 170 N.C. App. at 457, 613 S.E.2d at 273. Aside from noting that Petitioner is a member of a larger class of State employees and arguing that equal protection claims stemming from differential treatment based on the exercise of one's free speech rights or an employee's age, gender, or national ori-

---

9. N.C. Gen. Stat. § 126-1.1 states that, "unless the context clearly indicates otherwise, 'career State employee' means a State employee . . . who: (1) [i]s in a permanent position appointment; and (2) [h]as been continuously employed by the State of North Carolina . . . in a position subject to the State Personnel Act for the immediate 24 preceding months." In addition, as we have already noted, members of the University research staff, such as Petitioner, are expressly excluded from the coverage of the provisions of the State Personnel Act. N.C. Gen. Stat. § 126-5(c1)(8). Aside from the fact that she was a member of the University's research staff, Petitioner occupied a temporary, rather than a permanent, position and had been employed for less than 24 months at the time that Dr. Snider declined to renew her appointment.

gin should be subject to strict scrutiny, neither Petitioner nor the trial court made any effort to articulate the relevant respects in which career State employees and non-career State employees wishing to assert a grievance against their employer are similarly situated for equal protection purposes. Instead, Petitioner and the trial court have simply assumed that all State employees, or all State employees who have asserted a grievance, are similarly situated, an omission which fundamentally undermines Petitioner's equal protection claim. As a result, we conclude that Petitioner failed to assert a valid equal protection claim, find that the trial court committed an error of law in the event that it determined otherwise, and reverse the trial court's order to the extent that it found that Petitioner's equal protection rights had been violated.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court's determination that EPA Non-Faculty employees such as Petitioner are entitled to the protections of the Whistleblower Act is correct and should be affirmed. However, since the BOG failed to make adequate findings concerning the merits of Petitioner's claim under N.C. Gen. Stat. § 126-84 and the First Amendment and since the trial court deviated from the applicable standard of review during its consideration of the merits of those claims, we remand this case to the Orange County Superior Court for further remand to the BOG in order to permit the BOG to make adequate findings of fact addressing Petitioner's Whistleblower Act and First Amendment claims. In addition, we affirm the BOG's determination that Petitioner was not entitled to relief on the basis of her claim to have been subjected to age, gender, or nationality-based discrimination or to have been retaliated against for asserting such a claim on the grounds that the BOG's factual findings have adequate record support and reverse the trial court's decision to the contrary. Finally, we hold that Petitioner has not established the existence of valid due process or equal protection claims and that the trial court erred in reaching a different conclusion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

Judge STEELMAN concurs.

Judge Elmore concurs in part, concurs in the result in part, and dissents in part by separate opinion.

ELMORE, Judge, concurring in part, concurring in the result in part, and dissenting in part.

I concur with the Court's determination that the UNC-Chapel Hill EPA Non-Faculty Grievance Procedure did not violate petitioner's rights to procedural due process or equal protection of the laws under the North Carolina Constitution. I also concur with the Court's decision to remand this case to the Orange County Superior Court. However, I respectfully dissent from the Court's holding that EPA Non-Faculty employees such as petitioner are entitled to the protections of the Whistleblower Act. As a result, I concur in the Court's decision in part, concur in the result reached in the Court's decision in part, and dissent from the Court's decision in part.

N.C. Gen. Stat. § 126-5(c1) states that the North Carolina Whistleblower Act does not apply to "[a] State employee who is not a career state employee as defined by this Chapter." N.C. Gen. Stat. § 126-5(c1) (2009). A career state employee under this chapter is defined as one who:

(1) Is in a permanent position appointment; and

(2) Has been continuously employed by the State of North Carolina or a local entity as provided in G.S. 126 5(a)(2) in a position subject to the State Personnel Act for the immediate 24 preceding months.

N.C. Gen. Stat. § 126-1.1 (2009).

Here, petitioner was not in a permanent employment position. Her position was for the term of one year, and it was subject to the continued availability of funds. Furthermore, as the majority has correctly determined, petitioner's position as an EPA Non-Faculty employee was not subject to the State Personnel Act. Therefore, the North Carolina Whistleblower Act did not apply to petitioner.

The majority cites N.C. Gen. Stat. § 126-5(c5) as the basis for protection of petitioner under the Whistleblower Act. However, this section of the statute specifically states that, "[n]otwithstanding any other provision of this Chapter, Article 14 of this Chapter shall apply to all State employees, public school employees, and community college employees." N.C. Gen. Stat. § 126-5(c5) (2009). The very language of this section itself clearly indicates that § 126-5(c5) *only* applies *notwithstanding* any other provision. This language clearly indicates that § 126-5(c5) is meant to operate as a residuary, or catch-all, provision that is applicable only when the statute does not other-

wise provide to the contrary. Here, N.C. Gen. Stat. § 126-5(c1) very clearly articulates that the Whistleblower Act does not apply to a state employee who is not a career state employee. The statute further provides a very precise definition of a career state employee. Here, petitioner clearly does not satisfy either part of the definition of a career state employee. Petitioner was 1) not in a permanent employment position, and 2) her position was not subject to the State Personnel Act.

As a result, I am unable to agree with the Court's determination that petitioner was entitled to the protections of the Whistleblower Act. I agree with the Court's determination that this case should be remanded to the superior court. However, I conclude that remand would be proper only with instructions to the trial court to affirm the final decision of the Board of Governors consistent with this dissent.