IN THE COURT OF APPEALS OF NORTH CAROLINA

 Nos. COA15-699-2, COA15-763-2, COA15-829-2
 Filed: 6 June 2017

N.C. Industrial Commission, I.C. No. U00037

IN THE MATTER OF HUGHES, by and through V.H. INGRAM, Administratrix of
the Estate of Hughes, Claim for Compensation Under the North Carolina Eugenics
Asexualization and Sterilization Compensation Program, Claimant-Appellant.

 ____________________________________

 No. COA15-763-2

 Filed: 6 June 2017

N.C. Industrial Commission, I.C. No. U00438

IN THE MATTER OF REDMOND, by and through L. NICHOLS, Administratrix of
the Estate of Redmond, Claim for Compensation Under the North Carolina Eugenics
Asexualization and Sterilization Compensation Program, Claimant-Appellant.

 ____________________________________

 No. COA15-829-2

 Filed: 6 June 2017

N.C. Industrial Commission, No. U00750

IN THE MATTER OF SMITH, Claim for Compensation Under the North Carolina
Eugenics Asexualization and Sterilization Compensation Program, Claimant-
Appellant.

 Appeal by Claimant-Appellant Hughes, by and through V.H. Ingram,

Administratrix of the Estate of Hughes, from amended decision and order entered 28

April 2015 by the North Carolina Industrial Commission. Appeal by Claimant-

Appellant Redmond, by and through L. Nichols, Administratrix of the Estate of
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

Redmond, from decision and order entered 27 April 2015 by the North Carolina

Industrial Commission. Appeal by Claimant-Appellant Smith from decision and

order entered 7 May 2015 by the North Carolina Industrial Commission. Heard

originally in the Court of Appeals 16 November 2015. Reversed and remanded by the

Supreme Court of North Carolina to the Court of Appeals for consideration of the

merits of Claimants’ constitutional challenge to N.C. Gen. Stat. § 143B-426.50(1).

 Pressly, Thomas & Conley, PA, by Edwin A. Pressly; and UNC Center for Civil
 Rights, by Elizabeth McLaughlin Haddix, for Claimant-Appellants.

 Attorney General Roy Cooper, by Assistant Attorney General Marc X. Sneed, for
 North Carolina Department of Justice, Tort Claims Section.

 McGEE, Chief Judge.

 I. Facts and Procedural History

 The General Assembly enacted the Eugenics Asexualization and Sterilization

Compensation Program (“the Compensation Program”), N.C. Gen. Stat. § 143B-

426.50 et seq., in 2013, in order to provide compensation to victims of the North

Carolina Eugenics laws. 2013 N.C. Sess. Laws 360, s. 6.18(a). Ms. Hughes

(“Hughes”), Ms. Redmond (“Redmond”), and Mr. Smith (“Smith”)1 (Hughes,

Redmond, and Smith together, “the Victims”) were all “sterilized involuntarily under

the authority of the Eugenics Board of North Carolina [‘Eugenics Board’] in

 1 We avoid using the full names of these individuals in order to protect their anonymity.

 -2-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

accordance with Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public

Laws of 1937.” N.C. Gen. Stat. § 143B-426.50(5) (2013).2 Hughes died in 1996,

Redmond died in 2010, and Smith died in 2006.

 Because the North Carolina Industrial Commission (“Industrial Commission”)

concluded that the Victims were “asexualized involuntarily or sterilized involuntarily

under the authority of the Eugenics Board of North Carolina in accordance with

Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937[,]”

they were all “qualified recipients” pursuant to the Compensation Program. N.C.

Gen. Stat. § 143B-426.50(5) (2013). However, N.C. Gen. Stat. § 143B-426.50(1)

limited which qualified recipients could become successful claimants as follows:

“Claimant. – An individual on whose behalf a claim is made for compensation as a

qualified recipient under this Part. An individual must be alive on June 30, 2013, in

order to be a claimant.” N.C. Gen. Stat. § 143B-426.50(1) (emphasis added).

Therefore, pursuant to the plain language of N.C. Gen. Stat. § 143B-426.50(1), the

Victims, all of whom died before 2013, are not considered “claimants” for the purposes

of the Compensation Program. The Compensation Program states that only “[a]

 2 The Compensation Program, N.C. Gen. Stat. § 143B–426.50 et seq., “[e]xpired pursuant to
Session Laws 2013-360, s. 6.18(g), as amended by Session Laws 2014-100, s. 6.13(e), effective June 20,
2015.” See N.C. Gen. Stat. § 143B-426.50 (2015). However, because these claims were timely initiated
pursuant to the rules of the Compensation Program, we apply N.C. Gen. Stat. § 143B–426.50 et seq.
(2013), as these statutes were still in effect at the time these claims were filed.

 -3-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

claimant determined to be a qualified recipient under this Part shall receive

compensation[.]” N.C. Gen. Stat. § 143B-426.51(a) (2013) (emphasis added).

 The estates of Hughes, Redmond, and Smith (“the Estates”) filed claims

pursuant to the Compensation Program. However, because the Victims all died

before 30 June 2013, they were determined not to meet the definition of “claimant”

under the Compensation Program, and the Estates’ claims were denied. The Estates

appealed the initial denial of their claims, and their claims were heard by deputy

commissioners. Following denials by the deputy commissioners, the Estates filed

appeals to the Full Commission. N.C. Gen. Stat. § 143B-426.53 (2013). Following

denial of their claims by the Full Commission, the Estates filed notices of appeal with

this Court, arguing that N.C. Gen. Stat. § 143B-426.50(1) was unconstitutional on its

face because it arbitrarily denied compensation to the heirs of some victims while

allowing compensation to others. This matter was heard originally in the Court of

Appeals 16 November 2015, and this Court filed opinions on 16 February 2016, with

one judge dissenting, in which we held that this Court lacked jurisdiction to address

the Estates’ facial constitutional challenge to N.C. Gen. Stat. § 143B-426.50(1). In re

Hughes, __ N.C. App. __, 785 S.E.2d 111 (2016); In re Redmond, __ N.C. App. __, 785

S.E.2d 111 (2016); In re Smith, __ N.C. App. __, 785 S.E.2d 111 (2016).

 Upon review, our Supreme Court reversed and remanded to this Court for

consideration of the merits of Claimants’ constitutional challenge to subsection 143B-

 -4-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

426.50(1). In re Hughes, __ N.C. __, 796 S.E.2d 784 (2017); In re Smith, __ N.C. __,

797 S.E.2d 264, (2017); In re Redmond, __ N.C. __, 797 S.E.2d 275 (2017). We now

address the merits of the Estates’ facial constitutional challenge to N.C. Gen. Stat. §

143B-426.50(1).

 II. Analysis

 On appeal, the Estates argue that N.C. Gen. Stat. § 143B-426.50(1) violates

the North Carolina and the United States constitutions by violating their rights to

equal protection under the law. We cannot agree.

 A. History of the Compensation Program

 “North Carolina’s eugenics program was unlike most in the nation, sterilizing

approximately 7,600 people over 45 years.” REP. PAUL STAM AND AMY O’NEAL, Eugenics

in North Carolina, 3 (2016), at http://paulstam.info/wp-

content/uploads/2016/10/Eugenics-in-North-Carolina-Updated-Oct.-2016.pdf. In

light of the history of eugenics in North Carolina,

 North Carolina leaders realized that, through its Eugenics
 Board, the State invaded the lives and bodies of thousands
 of its citizens and forcibly took away their ability to choose
 whether to have children. Commissions and task forces
 debated whether to compensate the victims. Many in the
 General Assembly, including Speaker of the House Thom
 Tillis and House Majority Leader Paul Stam, hoped to
 accomplish this through the Eugenics Compensation
 Program (HB 947) during the 2012 Short Session. They
 wished “to make restitution for injustices suffered and
 unreasonable hardships endured by the asexualization or
 sterilizations of individuals at the direction of the State

 -5-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

 between 1933 and 1974.” The bill would have offered
 $50,000 in compensation to those who were sterilized
 under the N.C. Eugenics Board, but not to the families of
 victims who died before May 16, 2012. While HB 947
 passed the House by a vote of 86 to 31 and funds were
 appropriated in the budgets of the House and Governor,
 the bill never made it to the Senate floor.

Id. at 4. One of the task forces mentioned above was created by executive order on 8

March 2011: “The Governor’s Task Force [‘Task Force’] to Determine the Method of

Compensation for Victims of North Carolina’s Eugenics Board[.]” N.C. Executive

Order No. 83 (2011). In this executive order, the Governor recognized that the

General Assembly had already “established panels to explore and make

recommendations for compensating and counseling persons who were sterilized under

the . . . Eugenics Board program[,]” and that “it is now appropriate to identify persons

who were sterilized by force or coercion and to explore and determine the possible

methods and forms of compensation to those persons.” Id. The first duty assigned to

the Task Force was to “[r]ecommend possible methods or forms of compensation to

those persons forcibly sterilized under the . . . Eugenics Board program.” Id.

(emphasis added). The Task Force submitted its “Final Report” to the Governor on

27 January 2012. THE GOVERNOR’S TASK FORCE TO DETERMINE THE METHOD OF

COMPENSATION FOR VICTIMS OF NORTH CAROLINA’S EUGENICS BOARD, Final Report to the

Governor of the State of North Carolina (2012), at

http://www.sterilizationvictims.nc.gov/documents/FinalReport-

 -6-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

GovernorsEugenicsCompensationTaskForce.pdf. In its “Letter of Transmittal” of the

“Final Report,” the Task Force set forth its reasoning as follows:

 Compensation for these survivors serves two purposes. No
 amount of money can adequately pay for the harm done to
 these citizens, but financial compensation and other
 services we recommend will nonetheless provide
 meaningful assistance. Compensation also serves a larger
 purpose for all of us who live in North Carolina and rely on
 a government that respects our rights and leaves us free to
 live the lives we choose. The compensation package we
 recommend sends a clear message that we in North
 Carolina are a people who pay for our mistakes and that
 we do not tolerate bureaucracies that trample on basic
 human rights.

 ....

 We also want to clarify our thinking on whether
 compensation should cover the estates of all victims or be
 limited to living victims. We know that children of
 eugenics victims suffer from the hardships their parents
 endured, but we believe, nonetheless, that financial
 compensation should go only to living victims. Those who
 were sterilized suffered direct harm by the state and we
 would like the state to pay them for that pain.

Id. at 1-2.

 In the conclusion of the Final Report, the Task Force acknowledged certain

limitations and injustices that were a necessary byproduct of achieving a workable

solution to the compensation issue:

 In an effort to balance the need to compensate victims for
 the pain and hardships that they endured and the need to
 pass an overdue compensation plan this year, the Task
 Force made a difficult choice to limit compensation to living

 -7-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

 victims as defined in our recommendations. . . . .

 The Task Force recognizes that some of the descendants of
 deceased victims have expressed great frustration that the
 state could exclude them from a final compensation plan.
 The Task Force members hope that the descendants will
 recognize the difficult task faced in developing these
 recommendations. The final recommendation prioritized a
 need to provide justice before time runs out to the
 remaining 1,500 to 2,000 victims who endured the direct,
 frontline pain and humiliation of this program.

Id. at 13. The Task Force defined “living victims,” and stated that once living victims

had been properly verified, they should receive a vested interest in their

compensation share:

 The phrase “living victims” shall mean all living victims
 who have been verified by the Foundation or other state
 agency at the time legislation is passed as well as living
 victims verified by the Foundation moving forward.

 Once these individuals have been properly verified as
 living victims, they should be deemed to have a vested
 interest in any compensation. Once they have this vested
 interest, if they should become deceased before any
 monetary sum is established and paid to them, then the
 vested interest becomes a part of their estate, and any
 compensation authorized by the legislature could be
 payable to their estate.

Id. at 11 (emphasis added).

 Members of the General Assembly also recognized a difference between the

surviving relatives of deceased sterilization victims, “those ‘who were not the subject

of any clear and direct harm . . . any harm suffered [by heirs] would be vague and not

 -8-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

individual in nature, but instead a generalized societal harm[,]’” and those

“thousands of forced sterilizations victims [who] are still living.” Eugenics in North

Carolina at 5 (citation omitted). Creation of the Compensation Program moved

forward in 2013:

 While bills creating the Eugenics Compensation Program
 were introduced in the House and Senate Floor, the
 program was ultimately included in the budget. The
 General Assembly appropriated $10 million to be divided
 between the total number of qualified claimants. To
 qualify for compensation, sterilization victims must have
 been alive on June 30, 2013, provide adequate
 documentation of being involuntarily sterilized, and
 submit the appropriate form by June 30, 2014.

Eugenics in North Carolina at 6 (citations omitted).

 The $10 million appropriated to cover compensation for the victims would

clearly not result in compensation approaching $50,000.00 if even 1,500 victims were

verified as claimants according to the method of payment established in N.C. Gen.

Stat. § 143B-426.51. Put simply, once all claims have been processed by the

Industrial Commission, and appeals from rejected claims finally decided, the $10

million appropriation will be divided equally among each successful claimant. N.C.

Gen. Stat. § 143B-426.51(a) (2014).3

 We note that the Task Force estimated between 1,500 and 2,000 victims, out

 3 The General Assembly has enacted legislation allowing some compensation to be disbursed
to those individuals who have already been determined to be qualified recipient claimants. The
remainder of the appropriated funds will be disbursed once all appeals have been decided. N.C. Gen.
Stat. § 143B-426.51(a).

 -9-
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

of an estimated 7,600 total victims, were still living in 2012. Had 2,000 surviving

victims been found to be proper claimants, each claimant’s share of the $10 million

would have been $5,000.00. Had the number of claimants been 1,500, each claimant’s

share would have been $6,667.00.4 Had all of the estimated 7,600 total victims – or

their estates – been compensated, each victim or estate would have received

approximately $1,300.00. However, only 780 claims were filed by the deadline,5 less

than 250 claims have been currently approved by the Industrial Commission, and

only a handful are still awaiting final resolution on appeal. Therefore, compensation

for each claimant could reach close to the $50,000.00 goal recommended by the Task

Force and originally requested in HB 947.

 The General Assembly set forth its intent in creating the Compensation

Program in the preambles of the enacting bills of the successful legislation (HB 7 and

SB 464):

 Whereas, it is the policy and intent of this State to provide
 compensation for certain individuals who were lawfully
 asexualized or sterilized under the authority of the
 Eugenics Board of North Carolina in accordance with
 Chapter 224 of the Public Laws of 1933 or Chapter 221 of
 the Public Laws of 1937; and

 Whereas, the General Assembly recognizes that the State
 has no legal liability for these asexualization or
 sterilization procedures and that any applicable statutes of
 limitations have long since expired for the filing of any

 4 See also Eugenics in North Carolina at 5, (“the cost of compensating 1,500 victims at $50,000
per victim would be $75 million”).
 5 Eugenics in North Carolina at 7.

 - 10 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

 claims against the State for injuries caused; and

 Whereas, the General Assembly wishes to make restitution
 for injustices suffered and unreasonable hardships
 endured by the asexualization or sterilization of
 individuals at the direction of the State between 1933 and
 1974[.]

 ....

 Now, therefore,

 The General Assembly of North Carolina enacts:

 SECTION 1. Article 9 of Chapter 143B of the General
 Statutes is amended by adding a new Part to read:

 Part 30. Eugenics Asexualization and Sterilization
 Compensation Program.

2013 North Carolina Senate Bill 464; 2013 North Carolina House Bill 7.

 Specifically, the General Assembly stated that the “policy and intent [was] to

provide compensation for certain individuals who were lawfully asexualized or

sterilized under the authority of the Eugenics Board of North Carolina[,]” and that

“the General Assembly wishe[d] to make restitution for injustices suffered and

unreasonable hardships endured by the asexualization or sterilization of individuals

at the direction of the State between 1933 and 1974[.]” Id. There is nothing in this

preamble indicating that the General Assembly intended to compensate the heirs of

individuals who had been sterilized under the authority of the Eugenics Board. In

fact, the Compensation Program contains both specific and inferred evidence that the

 - 11 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

General Assembly intended to provide compensation to those identified sterilization

victims who were still living, and to exclude the heirs of those victims who had already

died. In short, the Compensation Program seems to have been designed in accordance

with the stated goals of certain members of the General Assembly, and the Final

Report of the Task Force, to provide restitution to the living survivors of involuntary

asexualization or sterilization by the Eugenics Board.

 Much of the Compensation Program tracks the recommendations of lawmakers

and the Task Force. Most relevantly for the purposes of our review, the General

Assembly’s enactment of N.C. Gen. Stat. § 143B-426.50(1) explicitly limited

compensation to living victims – thus excluding heirs of deceased victims – in order

to maximize payment amounts to those who actually suffered involuntary

sterilization: “An individual must be alive on June 30, 2013, in order to be a claimant.”

N.C. Gen. Stat. § 143B-426.50(1). Further, the General Assembly mandated: ”If any

claimant shall die during the pendency of a claim, or after being determined to be a

qualified recipient, any payment shall be made to the estate of the decedent.” N.C.

Gen. Stat. § 143B-426.51(b).

 The General Assembly provided compensation solely to living victims in order

to allow greater compensation to those individuals who personally suffered the pain

and indignity of involuntary sterilization. The General Assembly also provided that,

once a living victim was determined to be a valid claimant, or a potential claimant

 - 12 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

properly initiated a claim, that claim would vest in the claimant or potential claimant.

Therefore, should that claimant or potential claimant die before final resolution

and/or compensation was completed, any appropriate compensation would be made

to the estate of the deceased claimant.

 B. Equal Protection Law

 As this Court has stated:

 The Equal Protection Clause of Article I, Section 19 of the
 North Carolina Constitution and the Equal Protection
 Clause of Section 1 of the Fourteenth Amendment to the
 United States Constitution forbid North Carolina from
 denying any person the equal protection of the laws, and
 require that all persons similarly situated be treated alike.

Krueger v. N.C. Criminal Justice Educ. & Training Standards Comm’n, 230 N.C.

App. 293, 301, 750 S.E.2d 33, 40 (2013). The Estates argue that the requirement in

N.C. Gen. Stat. § 143B-426.50(1)

 that a victim be alive on 30 June 2013 violates the equal
 protection guarantees of Article 1, § 19 of the N.C.
 Constitution and the Fourteenth Amendment of the U.S.
 Constitution. The government can show no valid state
 interest that is rationally served by the differential
 treatment of heirs of victims alive on 30 June 2013 and
 heirs of victims who had died by that date.

 This Court has reviewed the requirements of analysis pursuant to the Equal

Protection Clause:

 “The Equal Protection Clause of the Fourteenth
 Amendment provides that no State shall ‘deny to any
 person within its jurisdiction the equal protection of the

 - 13 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

 laws.’ The United States Supreme Court has ‘explained
 that the purpose of the [E]qual [P]rotection [C]lause of the
 Fourteenth Amendment is to secure every person within
 the State’s jurisdiction against intentional and arbitrary
 discrimination, whether occasioned by express terms of a
 statute or by its improper execution through duly
 constituted agents.’” Thus, while the principle of
 substantive due process protects citizens from arbitrary or
 irrational laws and government policies, the right to equal
 protection guards against the government’s use of
 invidious classification schemes. “Of course, most laws
 differentiate in some fashion between classes of persons.
 The Equal Protection Clause does not forbid classifications.
 It simply keeps governmental decisionmakers from
 treating differently persons who are in all relevant respects
 alike.”

Wang v. UNC-CH Sch. of Med., 216 N.C. App. 185, 202–03, 716 S.E.2d 646, 657–58

(2011) (citations omitted). Therefore,

 “[t]o establish an equal protection violation, [Petitioner]
 must identify a class of similarly situated persons who are
 treated dissimilarly.” Thus, “[i]n addressing an equal
 protection challenge, we first identify the classes involved
 and determine whether they are similarly situated.”

 For that reason, Petitioner was required to show as an
 integral part of her equal protection claim that similarly
 situated individuals were subjected to disparate treatment.
 Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir.
 2003) (stating that “[a] Plaintiff relying on disparate
 treatment evidence must show that she was similarly
 situated in all material respects to the individuals with
 whom she seeks to compare herself”)[.]

Wang, 216 N.C. App. at 204, 716 S.E.2d at 658 (citations omitted).

 Generally, Equal Protection claims are subject to rational basis review:

 - 14 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

 The Equal Protection Clause is not violated merely because
 a statute classifies similarly situated persons differently,
 so long as there is a reasonable basis for the distinction.
 When a statute is challenged on equal protection grounds,
 it is subjected to a two-tiered analysis. . . . . If a statute
 does not burden the exercise of a fundamental right or
 operate to the peculiar disadvantage of a suspect class, the
 statute is analyzed under the second tier and the
 government need only show that the classification in the
 challenged statute has some rational basis. A statute
 survives analysis under this level if it bears some rational
 relationship to a conceivable, legitimate interest of
 government. Statutes subject to this level of review come
 before the Court with a presumption of constitutionality.

Town of Beech Mountain v. County of Watauga, 91 N.C. App. 87, 90-91, 370 S.E.2d

453, 454-55 (1988) (citations omitted). The Estates seem to acknowledge that their

Equal Protection claim is subject to “rational basis” review in stating: “Generally, a

law will survive the scrutiny if the distinction rationally furthers a legitimate state

purpose. However, courts have repeatedly struck down arbitrary classifications such

as that made by the living victim threshold in N.C.G.S. §146B-426.50 under the

rational basis standard.” (Citation omitted).6 Therefore, we must approach the

present matter presuming N.C. Gen. Stat. § 143B-426.50(1) is constitutional. Id. at

91, 370 S.E.2d at 455.

 6 In the concluding paragraphs of the argument sections in the Estates’ briefs, they make a
brief argument that “compelling state interest” review should be applied because the harm done,
involuntary sterilization, was a “violation of fundamental constitutional rights[.]” We do not find the
Estates’ argument for heightened review persuasive, and we apply “rational basis” review.

 - 15 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

 As the United States Supreme Court has held, it does not violate the Equal

Protection Clause to provide special benefits to certain citizens based upon sacrifices

they have made, voluntarily or involuntarily, in the furtherance of some

governmental objective. See Hooper v. Bernalillo Cty. Assessor, 472 U.S. 612, 620, 86

L. Ed. 2d 487, __ (1985) (citation omitted) (special state benefits granted Vietnam

veterans was constitutional as a means to “compensate in some measure for the

disruption of a way of life . . . and to express gratitude[;]” however, conditioning

benefits on length of residency in the state does not survive equal protection review).7

The General Assembly’s decision to compensate the victims of our State’s eugenics

program does not run afoul of the Equal Protection Clause as a general matter.

Therefore, we must consider (1) whether the Estates were similarly situated with

other beneficiaries and, if so, (2) whether there is some rational relationship between

any disparate treatment and “a conceivable, legitimate interest of government.”

Beech Mountain, 91 N.C. App. at 90-91, 370 S.E.2d at 454-55 (citation omitted).

 C. Similarly Situated

 7 We further note that the Compensation Program is similar to the Civil Liberties Act of 1988,
in which Congress established a fund to pay certain Americans who were interred during World War
II. That Act limited eligibility to the American citizens of Japanese ancestry who were still living on
the effective date of the Act. These criteria have been challenged, but have been consistently upheld.
See, e.g., Jacobs v. Barr, 959 F.2d 313 (1992); Shibayama v. United States, 55 Fed. Cl. 720 (2002);
Obadele v. United States, 52 Fed. Cl. 432 (2002).

 - 16 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

 The Estates focus on the heirs of victims, instead of the victims themselves, in

their Equal Protection analysis when they state: “The government can show no valid

state interest that is rationally served by the differential treatment of heirs of victims

alive on 30 June 2013 and heirs of victims who had died by that date.” However, the

“differential treatment” argued by the Estates is not between heirs of living victims

and heirs of deceased victims – it is between heirs of victims and the victims

themselves. Without discounting in any manner the injuries suffered by the families

of the victims due to the eugenics program, the estates of the victims are not similarly

situated to the actual victims themselves, who were forced to undergo involuntary

sterilization.

 In an effort to circumvent this distinction, the Estates argue that it is the

estates of all victims who are similarly situated and, therefore, disparate treatment

between the estates of victims must pass rational basis review. However, the

intended beneficiaries of the Compensation Program are the living victims of the

eugenics program. The Estates’ focus on the estates of deceased victims is

inappropriate in the Equal Protection analysis before us, and we hold that the Estates

are not similarly situated to the intended beneficiaries of the Compensation Program.

The Estates’ Equal Protection challenge fails for this reason.

 Further, assuming arguendo that the appropriate analysis is whether the

estates of all victims of the eugenics program are receiving disparate treatment, we

 - 17 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

still hold that the Estates fail to pass the threshold required to show they were

similarly situated to the estates of victims who died after 30 June 2013, but before

receiving compensation due. There are thousands of estates of deceased victims, and

it is likely that some of these victims initially began dying long ago. The General

Assembly clearly intended to limit compensation to living victims, not victims long-

ago, or even recently, deceased.

 As we do not think it requires probing constitutional analysis to determine that

deceased victims and living victims are not similarly situated for Confrontation

Clause purposes, we have little difficulty in finding that the heirs of the victims who

died before enactment of the Compensation Program are not similarly situated with

the heirs of the victims who lived to witness the enactment of the Compensation

Program, and who took the steps necessary to initiate claims for compensation.

 The former had no expectation of compensation, even following the enactment

of the Compensation Program, as they were specifically therein excluded. The latter

were able to join their victim benefactors-to-be in anticipation that these living

victims were finally going to receive compensation.8 More importantly, because the

intent of the Compensation Program was to compensate the living victims

themselves, both monetarily and emotionally, these living victims all received the

reassurance and compensation of knowing that if their claims were ultimately

 8In fact, heirs could file compensation claims on behalf of living victims. N.C. Gen. Stat. §
143B-426.50(1); N.C. Gen. Stat. § 143B-426.52(a) (2014).

 - 18 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

successful, the compensation would be granted, even if the actual victims failed to

survive the full claims process. We hold that the Estates were not similarly situated

with any intended victim beneficiaries of the Compensation Program.

 D. Rational Basis

 Assuming, arguendo, that the Estates had survived the “similarly situated”

prong of an Equal Protection Clause analysis, we further hold that the challenged

legislation demonstrates a “rational relationship between the disparate treatment

and ‘a conceivable, legitimate interest of government.’” Beech Mountain, 91 N.C. App.

at 90-91, 370 S.E.2d at 454-55 (citation omitted).

 The only accommodation made by the General Assembly in which a payout

pursuant to the Compensation Program would be made to the heirs of a deceased

victim who was involuntary sterilized under the authority of the Eugenics Board was

to the estates of those victims who were living at the time claims for compensation

could be filed on their behalves. At least one governmental interest supporting this

particular exception was identified in the Final Report:

 The phrase “living victims” applies to those living victims
 who have been verified by the state at the time legislation
 is approved and any living victim who applies for
 compensation from then on. In fairness to living victims
 who have already been verified, should any die before
 receiving compensation, the payment would go to their
 heirs.

 - 19 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

Final Report, at 2 (emphasis added). Stated differently, the purpose of the

Compensation Program was to monetarily compensate living victims only, not the

heirs of deceased victims. However, a living claimant would have the comfort of

knowing that his or her compensation would be awarded, even if that claimant pre-

deceased the payout. The comfort of that knowledge constituted a form of “restitution

for injustices suffered and unreasonable hardships endured by the asexualization or

sterilization of [those] individuals at the direction of the State between 1933 and

1974[.]” 2013 North Carolina Senate Bill 464; 2013 North Carolina House Bill 7.

 Compensating heirs of victims who died before enactment of the Compensation

Program could afford no such comfort or “restitution” to those sterilization victims,

as they had never established any expectation of compensation. Such a scheme could

only benefit the heirs, not the victims of involuntary sterilization themselves. This

option was clearly considered and rejected by the General Assembly.

 We readily identify several rational reasons for limiting compensation to living

victims: (1) addition of all heirs of deceased victims to the compensation pool could

have reduced the amount of compensation received by the actual victims to an

inconsequential amount; (2) the difficulty and cost of determining legitimate heirs of

deceased victims, some of whom had died more than eighty years earlier, would likely

be prohibitive; (3) the objective of the Compensation Program was not limited to

financially compensating living victims, but also included recognition of the

 - 20 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

particular wrong that had been done to them and, therefore, the Compensation

Program was focused only upon those living victims who could still benefit from both

the financial compensation and the emotional vindication accompanying the State’s

recognition, in a concrete manner, of the wrongs it had done to them.

 We entered our analysis with the presumption that N.C. Gen. Stat. § 143B-

426.50(1) is constitutional. Beech Mountain, 91 N.C. App. at 90-91, 370 S.E.2d at

454-55. We hold the Estates have failed to rebut this presumption because we hold

that the intent of the General Assembly to limit compensation to the living victims,

or, in rare instances, to the heirs of victims who had been living at the time

compensation through the Compensation Program became available to those victims,

as codified in N.C. Gen. Stat. § 143B-426.50(1) and related statutes, “bears some

rational relationship to a conceivable, legitimate interest of government.” Beech

Mountain, 91 N.C. App. at 91, 370 S.E.2d at 455 (citation omitted).

 III. Conclusion

 This Court reaches this determination following thorough review, and in no

manner means to suggest that the Estates in this matter, or the estates of other

victims excluded by the Compensation Program, are unworthy of recognition,

assistance, or compensation. We are limited to determining whether N.C. Gen. Stat.

§ 143B-426.50(1), on its face, violates the Equal Protection Clause rights of the

Estates by limiting compensation to victims whose rights in the Compensation

 - 21 -
 IN RE HUGHES; IN RE REDMOND; IN RE SMITH

 Opinion of the Court

Program had vested, and denying compensation to heirs of victims whose rights in

the Compensation Program never vested. We hold that the Estates have not

demonstrated they were similarly situated to other beneficiaries, and have not shown

that the legislation fails to bear a rational relationship to any legitimate

governmental interest. Therefore, we must reject the Estates’ arguments pursuant

to the constitutions of the United States and North Carolina.

 Pursuant to the mandates of our Supreme Court set forth in In re Hughes, __

N.C. __, 796 S.E.2d 784 (2017); In re Smith, __ N.C. __, 797 S.E.2d 264, (2017); and

In re Redmond, __ N.C. __, 797 S.E.2d 275 (2017), we determine that N.C. Gen. Stat.

§ 143B-426.50(1), on its face, does not violate the Equal Protection Clause, and we

therefore remand to the Industrial Commission with instruction to deny the claims

of the Estates.

 DECIDED AND REMANDED.

 Judges DILLON and DAVIS concur.

 - 22 -