McGEE, Chief Judge.
 

 *701
 
 I.
 
 Facts and Procedural History
 

 The General Assembly enacted the Eugenics Asexualization and Sterilization Compensation Program ("the Compensation Program"), N.C. Gen. Stat. § 143B-426.50
 
 et seq
 
 ., in 2013, in order to provide compensation to victims of the North Carolina Eugenics laws.
 
 2013 N.C. Sess. Laws 360
 
 , s. 6.18(a). Ms. Hughes ("Hughes"), Ms. Redmond ("Redmond"), and Mr. Smith ("Smith")
 
 [1]
 
 (Hughes, Redmond, and Smith together, "the Victims") were all "sterilized involuntarily under the authority of the Eugenics Board of
 
 *682
 
 North Carolina ['Eugenics Board'] in accordance with Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937." N.C. Gen. Stat. § 143B-426.50(5) (2013).
 
 [2]
 
 Hughes died in 1996, Redmond died in 2010, and Smith died in 2006.
 

 Because the North Carolina Industrial Commission ("Industrial Commission") concluded that the Victims were "asexualized involuntarily or sterilized involuntarily under the authority of the Eugenics Board of North Carolina in accordance with Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937[,]" they were all "qualified recipients" pursuant to the Compensation Program. N.C. Gen. Stat. § 143B-426.50(5) (2013). However, N.C. Gen. Stat. § 143B-426.50(1) limited which qualified recipients could become successful claimants as follows: "Claimant.-An individual on whose behalf a claim is made for compensation as a qualified recipient under this Part. An individual
 
 must be alive on June 30, 2013
 
 , in order to be a claimant." N.C. Gen. Stat. § 143B-426.50(1) (emphasis added). Therefore, pursuant to the plain language of N.C. Gen. Stat. § 143B-426.50(1), the Victims, all of whom died before 2013, are not considered "claimants" for the purposes
 
 *702
 
 of the Compensation Program. The Compensation Program states that only "[a]
 
 claimant
 
 determined to be a qualified recipient under this Part shall receive compensation[.]" N.C. Gen. Stat. § 143B-426.51(a) (2013) (emphasis added).
 

 The estates of Hughes, Redmond, and Smith ("the Estates") filed claims pursuant to the Compensation Program. However, because the Victims all died before 30 June 2013, they were determined not to meet the definition of "claimant" under the Compensation Program, and the Estates' claims were denied. The Estates appealed the initial denial of their claims, and their claims were heard by deputy commissioners. Following denials by the deputy commissioners, the Estates filed appeals to the Full Commission. N.C. Gen. Stat. § 143B-426.53 (2013). Following denial of their claims by the Full Commission, the Estates filed notices of appeal with this Court, arguing that N.C. Gen. Stat. § 143B-426.50(1) was unconstitutional on its face because it arbitrarily denied compensation to the heirs of some victims while allowing compensation to others. This matter was heard originally in the Court of Appeals 16 November 2015, and this Court filed opinions on 16 February 2016, with one judge dissenting, in which we held that this Court lacked jurisdiction to address the Estates' facial constitutional challenge to N.C. Gen. Stat. § 143B-426.50(1).
 
 In re Hughes
 
 , --- N.C.App. ----,
 
 785 S.E.2d 111
 
 (2016) ;
 
 In re Redmond
 
 , --- N.C.App. ----,
 
 785 S.E.2d 111
 
 (2016) ;
 
 In re Smith
 
 , --- N.C.App. ----,
 
 785 S.E.2d 111
 
 (2016).
 

 Upon review, our Supreme Court reversed and remanded to this Court for consideration of the merits of Claimants' constitutional challenge to subsection 143B-426.50(1).
 
 In re Hughes
 
 , --- N.C. ----,
 
 796 S.E.2d 784
 
 (2017) ;
 
 In re Smith
 
 , --- N.C. ----,
 
 797 S.E.2d 264
 
 (2017) ;
 
 In re Redmond
 
 , --- N.C. ----,
 
 797 S.E.2d 275
 
 (2017). We now address the merits of the Estates' facial constitutional challenge to N.C. Gen. Stat. § 143B-426.50(1).
 

 II.
 
 Analysis
 

 On appeal, the Estates argue that N.C. Gen. Stat. § 143B-426.50(1) violates the North Carolina and the United States constitutions by violating their rights to equal protection under the law. We cannot agree.
 

 A.
 
 History of the Compensation Program
 

 "North Carolina's eugenics program was unlike most in the nation, sterilizing approximately 7,600 people over 45 years." REP. PAUL STAM AND AMY O'NEAL ,
 
 Eugenics in North Carolina
 
 , 3 (2016), at http://paulstam.info/wpcontent/uploads/2016/10/Eugenics-in-North-Carolina-Updated-Oct.-2016.pdf.
 

 *703
 
 In light of the history of eugenics in North Carolina,
 

 *683
 
 North Carolina leaders realized that, through its Eugenics Board, the State invaded the lives and bodies of thousands of its citizens and forcibly took away their ability to choose whether to have children. Commissions and task forces debated whether to compensate the victims. Many in the General Assembly, including Speaker of the House Thom Tillis and House Majority Leader Paul Stam, hoped to accomplish this through the Eugenics Compensation Program (HB 947) during the 2012 Short Session. They wished "to make restitution for injustices suffered and unreasonable hardships endured by the asexualization or sterilizations of individuals at the direction of the State between 1933 and 1974." The bill would have offered $50,000 in compensation to those who were sterilized under the N.C. Eugenics Board, but not to the families of victims who died before May 16, 2012. While HB 947 passed the House by a vote of 86 to 31 and funds were appropriated in the budgets of the House and Governor, the bill never made it to the Senate floor.
 

 Id
 
 . at 4. One of the task forces mentioned above was created by executive order on 8 March 2011: "The Governor's Task Force ['Task Force'] to Determine the Method of Compensation for Victims of North Carolina's Eugenics Board[.]" N.C. Executive Order No. 83 (2011). In this executive order, the Governor recognized that the General Assembly had already "established panels to explore and make recommendations for
 
 compensating and counseling persons who were sterilized
 
 under the ... Eugenics Board program[,]" and that "it is now appropriate to identify persons who were sterilized by force or coercion and to explore and determine the possible methods and forms of compensation to those persons."
 
 Id
 
 . The first duty assigned to the Task Force was to "[r]ecommend possible methods or forms of compensation to
 
 those persons forcibly sterilized
 
 under the ... Eugenics Board program."
 
 Id
 
 . (emphasis added). The Task Force submitted its "Final Report" to the Governor on 27 January 2012. THE GOVERNOR'S TASK FORCE TO DETERMINE THE METHOD OF COMPENSATION FOR VICTIMS OF NORTH CAROLINA'S EUGENICS BOARD ,
 
 Final Report to the Governor of the State of North Carolina
 
 (2012), at http://www.sterilizationvictims.nc.gov/documents/FinalReport-GovernorsEugenicsCompensationTaskForce.pdf. In its "Letter of Transmittal" of the "Final Report," the Task Force set forth its reasoning as follows:
 

 *704
 
 Compensation for these survivors serves two purposes. No amount of money can adequately pay for the harm done to these citizens, but financial compensation and other services we recommend will nonetheless provide meaningful assistance. Compensation also serves a larger purpose for all of us who live in North Carolina and rely on a government that respects our rights and leaves us free to live the lives we choose. The compensation package we recommend sends a clear message that we in North Carolina are a people who pay for our mistakes and that we do not tolerate bureaucracies that trample on basic human rights.
 

 ....
 

 We also want to clarify our thinking on whether compensation should cover the estates of all victims or be limited to living victims. We know that children of eugenics victims suffer from the hardships their parents endured, but we believe, nonetheless, that financial compensation should go only to living victims. Those who were sterilized suffered direct harm by the state and we would like the state to pay them for that pain.
 

 Id
 
 . at 1-2.
 

 In the conclusion of the Final Report, the Task Force acknowledged certain limitations and injustices that were a necessary byproduct of achieving a workable solution to the compensation issue:
 

 In an effort to balance the need to compensate victims for the pain and hardships that they endured and the need to pass an overdue compensation plan this year, the Task Force made a difficult choice to limit compensation to living victims as defined in our recommendations.....
 

 The Task Force recognizes that some of the descendants of deceased victims have expressed great frustration that the state could exclude them from a final compensation
 
 *684
 
 plan. The Task Force members hope that the descendants will recognize the difficult task faced in developing these recommendations. The final recommendation prioritized a need to provide justice before time runs out to the remaining 1,500 to 2,000 victims who endured the direct, frontline pain and humiliation of this program.
 

 *705
 

 Id
 
 . at 13. The Task Force defined "living victims," and stated that once living victims had been properly verified, they should receive a vested interest in their compensation share:
 

 The phrase "living victims" shall mean all living victims who have been verified by the Foundation or other state agency at the time legislation is passed as well as living victims verified by the Foundation moving forward.
 

 Once these individuals have been properly verified as living victims, they should be
 
 deemed to have a vested interest in any compensation
 
 .
 
 Once they have this vested interest, if they should become deceased before any monetary sum is established and paid to them, then the vested interest becomes a part of their estate
 
 , and any compensation authorized by the legislature could be payable to their estate.
 

 Id
 
 . at 11 (emphasis added).
 

 Members of the General Assembly also recognized a difference between the surviving relatives of deceased sterilization victims, "those 'who were not the subject of any clear and direct harm ... any harm suffered [by heirs] would be vague and not individual in nature, but instead a generalized societal harm[,]' " and those "thousands of forced sterilizations victims [who] are still living."
 
 Eugenics in North Carolina
 
 at 5 (citation omitted). Creation of the Compensation Program moved forward in 2013:
 

 While bills creating the Eugenics Compensation Program were introduced in the House and Senate Floor, the program was ultimately included in the budget. The General Assembly appropriated $10 million to be divided between the total number of qualified claimants. To qualify for compensation, sterilization victims must have been alive on June 30, 2013, provide adequate documentation of being involuntarily sterilized, and submit the appropriate form by June 30, 2014.
 

 Eugenics in North Carolina
 
 at 6 (citations omitted).
 

 The $10 million appropriated to cover compensation for the victims would clearly not result in compensation approaching $50,000.00 if even 1,500 victims were verified as claimants according to the method of payment established in N.C. Gen. Stat. § 143B-426.51. Put simply, once all
 
 *706
 
 claims have been processed by the Industrial Commission, and appeals from rejected claims finally decided, the $10 million appropriation will be divided equally among each successful claimant. N.C. Gen. Stat. § 143B-426.51(a) (2014).
 
 [3]
 

 We note that the Task Force estimated between 1,500 and 2,000 victims, out of an estimated 7,600 total victims, were still living in 2012. Had 2,000 surviving victims been found to be proper claimants, each claimant's share of the $10 million would have been $5,000.00. Had the number of claimants been 1,500, each claimant's share would have been $6,667.00.
 
 [4]
 
 Had all of the estimated 7,600 total victims-or their estates-been compensated, each victim or estate would have received approximately $1,300.00. However, only 780 claims were filed by the deadline,
 
 [5]
 
 less than 250 claims have been currently approved by the Industrial Commission, and only a handful are still awaiting final resolution on appeal. Therefore, compensation for each claimant could reach close to the $50,000.00 goal recommended by the Task Force and originally requested in HB 947.
 

 The General Assembly set forth its intent in creating the Compensation Program in the
 
 *685
 
 preambles of the enacting bills of the successful legislation (HB 7 and SB 464):
 

 Whereas, it is the policy and intent of this State to provide compensation for certain individuals who were lawfully asexualized or sterilized under the authority of the Eugenics Board of North Carolina in accordance with Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937; and
 

 Whereas, the General Assembly recognizes that the State has no legal liability for these asexualization or sterilization procedures and that any applicable statutes of limitations have long since expired for the filing of any claims against the State for injuries caused; and
 
 *707
 
 Whereas, the General Assembly wishes to make restitution for injustices suffered and unreasonable hardships endured by the asexualization or sterilization of individuals at the direction of the State between 1933 and 1974[.]
 

 ....
 

 Now, therefore,
 

 The General Assembly of North Carolina enacts:
 

 SECTION 1. Article 9 of Chapter 143B of the General Statutes is amended by adding a new Part to read:
 

 Part 30. Eugenics Asexualization and Sterilization Compensation Program.
 

 2013 North Carolina Senate Bill 464; 2013 North Carolina House Bill 7.
 

 Specifically, the General Assembly stated that the "policy and intent [was] to provide compensation for
 
 certain individuals
 
 who were
 
 lawfully asexualized or sterilized
 
 under the authority of the Eugenics Board of North Carolina[,]" and that "the General Assembly wishe[d] to make restitution for injustices suffered and unreasonable hardships endured
 
 by the asexualization or sterilization of individuals
 
 at the direction of the State between 1933 and 1974[.]"
 
 Id
 
 . There is nothing in this preamble indicating that the General Assembly intended to compensate the
 
 heirs
 
 of individuals who had been sterilized under the authority of the Eugenics Board. In fact, the Compensation Program contains both specific and inferred evidence that the General Assembly intended to provide compensation to those identified sterilization victims who were still living, and to
 
 exclude the heirs
 
 of those victims who had already died. In short, the Compensation Program seems to have been designed in accordance with the stated goals of certain members of the General Assembly, and the Final Report of the Task Force, to provide restitution to the
 
 living survivors
 
 of involuntary asexualization or sterilization by the Eugenics Board.
 

 Much of the Compensation Program tracks the recommendations of lawmakers and the Task Force. Most relevantly for the purposes of our review, the General Assembly's enactment of N.C. Gen. Stat. § 143B-426.50(1) explicitly limited compensation to living victims-thus excluding heirs of deceased victims-in order to maximize payment amounts to those who actually suffered involuntary sterilization: "An individual must be alive on June 30, 2013, in order to be a claimant." N.C. Gen. Stat. § 143B-426.50(1). Further, the General Assembly mandated: "
 
 If
 

 *708
 

 any claimant shall die during the pendency of a claim, or after being determined to be a qualified recipient, any payment shall be made to the estate of the decedent
 
 ." N.C. Gen. Stat. § 143B-426.51(b).
 

 The General Assembly provided compensation solely to living victims in order to allow greater compensation to those individuals who
 
 personally
 
 suffered the pain and indignity of involuntary sterilization. The General Assembly also provided that, once a living victim was determined to be a valid claimant, or a potential claimant properly initiated a claim, that claim would vest in the claimant or potential claimant. Therefore, should that claimant or potential claimant die before final resolution and/or compensation was completed, any appropriate compensation would be made to the estate of the deceased claimant.
 

 B.
 
 Equal Protection Law
 

 As this Court has stated:
 

 The Equal Protection Clause of Article I, Section 19 of the North Carolina Constitution and the Equal Protection Clause of Section 1 of the Fourteenth Amendment to the United States Constitution forbid North Carolina from denying any person
 
 *686
 
 the equal protection of the laws, and require that all persons similarly situated be treated alike.
 

 Krueger v. N.C. Criminal Justice Educ. & Training Standards Comm'n
 
 ,
 
 230 N.C.App. 293
 
 , 301,
 
 750 S.E.2d 33
 
 , 40 (2013). The Estates argue that the requirement in N.C. Gen. Stat. § 143B-426.50(1)
 

 that a victim be alive on 30 June 2013 violates the equal protection guarantees of Article 1, § 19 of the N.C. Constitution and the Fourteenth Amendment of the U.S. Constitution. The government can show no valid state interest that is rationally served by the differential treatment of heirs of victims alive on 30 June 2013 and heirs of victims who had died by that date.
 

 This Court has reviewed the requirements of analysis pursuant to the Equal Protection Clause:
 

 "The Equal Protection Clause of the Fourteenth Amendment provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' The United States Supreme Court has 'explained that the purpose of the [E]qual [P]rotection [C]lause of the Fourteenth Amendment is to secure every person within
 
 *709
 
 the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " Thus, while the principle of substantive due process protects citizens from arbitrary or irrational laws and government policies, the right to equal protection guards against the government's use of invidious classification schemes. "Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."
 

 Wang v. UNC-CH Sch. of Med.
 
 ,
 
 216 N.C.App. 185
 
 , 202-03,
 
 716 S.E.2d 646
 
 , 657-58 (2011) (citations omitted). Therefore,
 

 "[t]o establish an equal protection violation, [Petitioner] must identify a class of similarly situated persons who are treated dissimilarly." Thus, "[i]n addressing an equal protection challenge, we first identify the classes involved and determine whether they are similarly situated."
 

 For that reason, Petitioner was required to show as an integral part of her equal protection claim that similarly situated individuals were subjected to disparate treatment.
 
 Mandell v. County of Suffolk
 
 ,
 
 316 F.3d 368
 
 , 379 (2d Cir. 2003) (stating that "[a] Plaintiff relying on disparate treatment evidence must show that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself")[.]
 

 Wang
 
 ,
 
 216 N.C.App. at 204
 
 ,
 
 716 S.E.2d at 658
 
 (citations omitted).
 

 Generally, Equal Protection claims are subject to rational basis review:
 

 The Equal Protection Clause is not violated merely because a statute classifies similarly situated persons differently, so long as there is a reasonable basis for the distinction. When a statute is challenged on equal protection grounds, it is subjected to a two-tiered analysis..... If a statute does not burden the exercise of a fundamental right or operate to the peculiar disadvantage of a suspect class, the statute is analyzed under the second tier and the government need only show that the classification in the challenged statute has some rational basis. A statute survives analysis
 
 *710
 
 under this level if it bears some rational relationship to a conceivable, legitimate interest of government. Statutes subject to this level of review come before the Court with a presumption of constitutionality.
 

 Town of Beech Mountain v. County of Watauga
 
 ,
 
 91 N.C.App. 87
 
 , 90-91,
 
 370 S.E.2d 453
 
 , 454-55 (1988) (citations omitted). The Estates seem to acknowledge that their Equal Protection claim is subject to "rational basis" review in stating: "Generally, a law will survive the scrutiny if the distinction rationally furthers a legitimate state purpose. However, courts have repeatedly struck down arbitrary classifications such as that made by the living victim threshold in N.C.G.S. § 146B-426.50 under the rational basis standard." (Citation
 
 *687
 
 omitted).
 
 [6]
 
 Therefore, we must approach the present matter presuming N.C. Gen. Stat. § 143B-426.50(1) is constitutional.
 
 Id
 
 . at 91,
 
 370 S.E.2d at 455
 
 .
 

 As the United States Supreme Court has held, it does not violate the Equal Protection Clause to provide special benefits to certain citizens based upon sacrifices they have made, voluntarily or involuntarily, in the furtherance of some governmental objective.
 
 See
 

 Hooper v. Bernalillo Cty. Assessor
 
 ,
 
 472 U.S. 612
 
 , 620,
 
 105 S.Ct. 2862
 
 , 2867,
 
 86 L.Ed.2d 487
 
 , 495 (1985) (citation omitted) (special state benefits granted Vietnam veterans was constitutional as a means to "compensate in some measure for the disruption of a way of life ... and to express gratitude[;]" however, conditioning benefits on length of residency in the state does not survive equal protection review).
 
 [7]
 
 The General Assembly's decision to compensate the victims of our State's eugenics program does not run afoul of the Equal Protection Clause as a general matter. Therefore, we must consider (1) whether the Estates were
 
 similarly situated
 
 with other beneficiaries and, if so, (2) whether there is some rational relationship between any disparate treatment and "a conceivable, legitimate interest of government."
 
 Beech Mountain
 
 ,
 
 91 N.C.App. at 90-91
 
 ,
 
 370 S.E.2d at 454-55
 
 (citation omitted).
 

 *711
 
 C.
 
 Similarly Situated
 

 The Estates focus on the
 
 heirs
 
 of victims, instead of the victims themselves, in their Equal Protection analysis when they state: "The government can show no valid state interest that is rationally served by the differential treatment of heirs of victims alive on 30 June 2013 and heirs of victims who had died by that date." However, the "differential treatment" argued by the Estates is not between heirs of living victims and heirs of deceased victims-it is between heirs of victims and the victims themselves. Without discounting in any manner the injuries suffered by the families of the victims due to the eugenics program, the estates of the victims are not similarly situated to the actual victims themselves, who were forced to undergo involuntary sterilization.
 

 In an effort to circumvent this distinction, the Estates argue that it is the
 
 estates of all victims
 
 who are similarly situated and, therefore, disparate treatment between the estates of victims must pass rational basis review. However, the intended beneficiaries of the Compensation Program are the
 
 living victims
 
 of the eugenics program. The Estates' focus on the estates of
 
 deceased victims
 
 is inappropriate in the Equal Protection analysis before us, and we hold that the Estates are not similarly situated to the intended beneficiaries of the Compensation Program. The Estates' Equal Protection challenge fails for this reason.
 

 Further, assuming
 
 arguendo
 
 that the appropriate analysis is whether the estates of
 
 all victims
 
 of the eugenics program are receiving disparate treatment, we still hold that the Estates fail to pass the threshold required to show they were similarly situated to the estates of victims who died after 30 June 2013, but before receiving compensation due. There are thousands of estates of deceased victims, and it is likely that some of these victims initially began dying long ago. The General Assembly clearly intended to limit compensation to living victims, not victims long-ago, or even recently, deceased.
 

 As we do not think it requires probing constitutional analysis to determine that deceased victims and living victims are not similarly situated for Confrontation Clause purposes, we have little difficulty in finding
 
 *688
 
 that the heirs of the victims who died before enactment of the Compensation Program are not similarly situated with the heirs of the victims who lived to witness the enactment of the Compensation Program, and who took the steps necessary to initiate claims for compensation.
 

 The former had no expectation of compensation, even following the enactment of the Compensation Program, as they were specifically
 
 *712
 
 therein excluded. The latter were able to join their victim benefactors-to-be in anticipation that these living victims were finally going to receive compensation.
 
 [8]
 
 More importantly, because the intent of the Compensation Program was to compensate the living victims themselves, both monetarily and emotionally, these living victims all received the reassurance and compensation of knowing that if their claims were ultimately successful, the compensation would be granted, even if the actual victims failed to survive the full claims process. We hold that the Estates were not similarly situated with any intended victim beneficiaries of the Compensation Program.
 

 D.
 
 Rational Basis
 

 Assuming,
 
 arguendo
 
 , that the Estates had survived the "similarly situated" prong of an Equal Protection Clause analysis, we further hold that the challenged legislation demonstrates a "rational relationship between the disparate treatment and 'a conceivable, legitimate interest of government.' "
 
 Beech Mountain
 
 ,
 
 91 N.C.App. at 90-91
 
 ,
 
 370 S.E.2d at 454-55
 
 (citation omitted).
 

 The
 
 only
 
 accommodation made by the General Assembly in which a payout pursuant to the Compensation Program would be made to the heirs of a deceased victim who was involuntary sterilized under the authority of the Eugenics Board was to the estates of those victims who were living at the time claims for compensation could be filed on their behalves. At least one governmental interest supporting this particular exception was identified in the Final Report:
 

 The phrase "living victims" applies to those living victims who have been verified by the state at the time legislation is approved and any living victim who applies for compensation from then on.
 
 In fairness to living victims who have already been verified, should any die before receiving compensation, the payment would go to their heirs.
 

 Final Report,
 
 at 2 (emphasis added). Stated differently, the purpose of the Compensation Program was to monetarily compensate
 
 living victims
 
 only, not the heirs of deceased victims. However,
 
 a living claimant
 
 would have the comfort of knowing that his or her compensation would be awarded, even if that claimant pre-deceased the payout. The comfort of that knowledge constituted a form of "restitution for injustices
 
 *713
 
 suffered and unreasonable hardships endured by the asexualization or sterilization of [those] individuals at the direction of the State between 1933 and 1974[.]" 2013 North Carolina Senate Bill 464; 2013 North Carolina House Bill 7.
 

 Compensating heirs of victims who died before enactment of the Compensation Program could afford no such comfort or "restitution" to those sterilization victims, as they had never established any expectation of compensation. Such a scheme could
 
 only
 
 benefit the heirs, not the victims of involuntary sterilization themselves. This option was clearly considered and rejected by the General Assembly.
 

 We readily identify several rational reasons for limiting compensation to living victims: (1) addition of all heirs of deceased victims to the compensation pool could have reduced the amount of compensation received by the actual victims to an inconsequential amount; (2) the difficulty and cost of determining legitimate heirs of deceased victims, some of whom had died more than eighty years earlier, would likely be prohibitive; (3) the objective of the Compensation Program was not limited to financially compensating living victims, but also included recognition of the particular wrong that had been done to them and, therefore, the Compensation Program was focused
 
 only
 
 upon those living victims who could still benefit from both the financial compensation and the
 
 *689
 
 emotional vindication accompanying the State's recognition, in a concrete manner, of the wrongs it had done to them.
 

 We entered our analysis with the presumption that N.C. Gen. Stat. § 143B-426.50(1) is constitutional.
 
 Beech Mountain
 
 ,
 
 91 N.C.App. at 90-91
 
 ,
 
 370 S.E.2d at 454-55
 
 . We hold the Estates have failed to rebut this presumption because we hold that the intent of the General Assembly to limit compensation to the living victims, or, in rare instances, to the heirs of victims who had been living at the time compensation through the Compensation Program became available to those victims, as codified in N.C. Gen. Stat. § 143B-426.50(1) and related statutes, "bears some rational relationship to a conceivable, legitimate interest of government."
 
 Beech Mountain
 
 ,
 
 91 N.C.App. at 91
 
 ,
 
 370 S.E.2d at 455
 
 (citation omitted).
 

 III.
 
 Conclusion
 

 This Court reaches this determination following thorough review, and in no manner means to suggest that the Estates in this matter, or the estates of other victims excluded by the Compensation Program, are unworthy of recognition, assistance, or compensation. We are limited to determining whether N.C. Gen. Stat. § 143B-426.50(1), on its face, violates the Equal Protection Clause rights of the Estates by limiting
 
 *714
 
 compensation to victims whose rights in the Compensation Program had vested, and denying compensation to heirs of victims whose rights in the Compensation Program never vested. We hold that the Estates have not demonstrated they were similarly situated to other beneficiaries, and have not shown that the legislation fails to bear a rational relationship to any legitimate governmental interest. Therefore, we must reject the Estates' arguments pursuant to the constitutions of the United States and North Carolina.
 

 Pursuant to the mandates of our Supreme Court set forth in
 
 In re Hughes
 
 , --- N.C. ----,
 
 796 S.E.2d 784
 
 (2017) ;
 
 In re Smith
 
 , --- N.C. ----,
 
 797 S.E.2d 264
 
 (2017) ; and
 
 In re Redmond
 
 , --- N.C. ----,
 
 797 S.E.2d 275
 
 (2017), we determine that N.C. Gen. Stat. § 143B-426.50(1), on its face, does not violate the Equal Protection Clause, and we therefore remand to the Industrial Commission with instruction to deny the claims of the Estates.
 

 DECIDED AND REMANDED.
 

 Judges DILLON and DAVIS concur.
 

 [1]
 

 We avoid using the full names of these individuals in order to protect their anonymity.
 

 [2]
 

 The Compensation Program, N.C. Gen. Stat. § 143B-426.50
 
 et seq.
 
 , "[e]xpired pursuant to Session Laws 2013-360, s. 6.18(g), as amended by Session Laws 2014-100, s. 6.13(e), effective June 20, 2015."
 
 See
 
 N.C. Gen. Stat. § 143B-426.50 (2015). However, because these claims were timely initiated pursuant to the rules of the Compensation Program, we apply N.C. Gen. Stat. § 143B-426.50
 
 et seq.
 
 (2013), as these statutes were still in effect at the time these claims were filed.
 

 [3]
 

 The General Assembly has enacted legislation allowing some compensation to be disbursed to those individuals who have already been determined to be qualified recipient claimants. The remainder of the appropriated funds will be disbursed once all appeals have been decided. N.C. Gen. Stat. § 143B-426.51(a).
 

 [4]
 

 See also Eugenics in North Carolina
 
 at 5, ("the cost of compensating 1,500 victims at $50,000 per victim would be $75 million").
 

 [5]
 

 Eugenics in North Carolina
 
 at 7.
 

 [6]
 

 In the concluding paragraphs of the argument sections in the Estates' briefs, they make a brief argument that "compelling state interest" review should be applied because the harm done, involuntary sterilization, was a "violation of fundamental constitutional rights[.]" We do not find the Estates' argument for heightened review persuasive, and we apply "rational basis" review.
 

 [7]
 

 We further note that the Compensation Program is similar to the Civil Liberties Act of 1988, in which Congress established a fund to pay certain Americans who were interred during World War II. That Act limited eligibility to the American citizens of Japanese ancestry
 
 who were still living on the effective date of the Act
 
 . These criteria have been challenged, but have been consistently upheld.
 
 See, e.g.,
 

 Jacobs v. Barr
 
 ,
 
 959 F.2d 313
 
 (D.C.Cir. 1992) ;
 
 Shibayama v. United States,
 

 55 Fed.Cl. 720
 
 (2002) ;
 
 Obadele v. United States
 
 ,
 
 52 Fed.Cl. 432
 
 (2002).
 

 [8]
 

 In fact, heirs could file compensation claims on behalf of living victims. N.C. Gen. Stat. § 143B-426.50(1) ; N.C. Gen. Stat. § 143B-426.52(a) (2014).